No. 22-55336

In The
# United States Court of Appeals for the Ninth Circuit

IOWA PORK PRODUCERS ASSOCIATION,

*Plaintiff-Appellant,*

v.

ROB BONTA, in his official capacity as
Attorney General of California, et al.,

*Defendants-Appellees,*

HUMANE SOCIETY OF THE UNITED STATES, ET AL.,

*Intervenors-Appellees.*

**On Appeal from the United States District Court
for the Central District of California**

**Case No. 2:21-cv-09940-CAS-AFM
The Honorable Christina A. Snyder**

## APPELLANT'S OPENING BRIEF

MICHAEL T. RAUPP
HUSCH BLACKWELL LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
Telephone (816) 983-8000
Facsimile (816) 983-8080
michael.raupp@huschblackwell.com

RYANN A. GLENN
HUSCH BLACKWELL LLP
13330 California Street, Suite 200
Omaha, NE 68154
Telephone: (402) 964-5000
Facsimile: (402) 964-5050
ryann.glenn@huschblackwell.com

August 4, 2023     *Counsel for Plaintiff-Appellant*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Plaintiff Iowa Pork Producers Association states as follows:

1.      Iowa Pork Producers Association is not a publicly held corporation.

2.      Iowa Pork Producers does not have a parent corporation and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

Page

Corporate Disclosure Statement................................................................i

Table of Authorities...............................................................................iv

Introduction..........................................................................................1

Jurisdictional Statement.........................................................................5

Issues Presented....................................................................................5

Pertinent Statutes and Regulations ........................................................6

Statement of the Case ...........................................................................6

Standard of Review .............................................................................20

Summary of the Argument ...................................................................20

Argument............................................................................................23

I.    The District Court Should Have Granted a Preliminary
      Injunction ....................................................................................23

      A. IPPA is likely to succeed on the merits of its Commerce
      Clause and Due Process Clause claims.....................................24

      1. IPPA has a fair chance of success on its Commerce Clause
      claims...................................................................................24

      a. Proposition 12 discriminates against out-of-state
      commerce ........................................................................27

      b. Proposition 12 fails the *Pike* test....................................34

      2. IPPA has a fair chance to succeed on its Due Process
      Clause    Claim    because    Proposition    12    is
      unconstitutionally vague .....................................................46

B. IPPA members will incur immediate and irreparable harm absent a preliminary injunction ................................................. 53

C. The balance of equities is strongly in favor of IPPA and a preliminary injunction is in the public's best interest ............. 56

II. IPPA Sufficiently Pleaded its Claims to Overcome a Motion to Dismiss .......................................................................................... 58

A. IPPA adequately pleaded its Commerce Clause claims and Due Process claims ................................................................. 58

B. IPPA sufficiently pleaded its Privileges and Immunities claim .................................................................................... 62

C. IPPA sufficiently pleaded its preemption claim ....................... 64

Conclusion ......................................................................................... 67

Statement of Related Cases ................................................................. 68

Certificate of Compliance ................................................................... 69

Certificate of Service .......................................................................... 70

Addendum

# TABLE OF AUTHORITIES

Page(s)

## **Cases**

*Airbnb, Inc. v. City and County of S.F.,*
217 F. Supp. 3d 1066 (N.D. Cal. 2016) ................................. 54

*Alpha Phoenix Industries, LLC v. SCI International, Inc.,*
666 F. App'x 598 (9th Cir. 2016) ......................................... 31

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles,*
559 F.3d 1046 (9th Cir. 2009) ............................................. 53

*Arizona Dream Act Coal. v. Brewer,*
757 F.3d 1053 (9th Cir. 2014) ............................................. 53

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris,*
729 F.3d 937 (9th Cir. 2013) ......................................... 27, 32

*Babbitt v. United Farm Workers Nat'l Union,*
442 U.S. 289 (1979) ............................................................ 60

*Baldwin v. Fish and Game Comm'n of Montana,*
436 U.S. 371 (1978) ............................................................ 63

*Brown–Forman Distillers Corp. v. N.Y. State Liquor Auth.,*
476 U.S. 573 (1986) ............................................................ 26

*Cal. Teachers Ass'n v. St. Bd. of Educ.,*
263 F.3d 888 (9th Cir. 2001) ............................................. 52

*California v. Azar,*
911 F.3d 558 (9th Cir. 2018) ............................................. 55

*California Hosp. Ass'n v. Maxwell-Jolly,*
No. CIV S-10-3465, 2011 WL 285866 (E.D. Cal. Jan. 28, 2011) ......... 55

*Citizens United v. Fed. Election Comm'n,*
  558 U.S. 310 (2010) ............................................................ 46

*City of Phila. v. New Jersey,*
  437 U.S. 617 (1978) ............................................................ 37

*Craigmiles v. Giles,*
  312 F.3d 220 (6th Cir. 2002) ............................................ 37

*Cristobal v. Siegel,*
  26 F.3d 1488 (9th Cir. 1994) ............................................ 31

*Dep't of Revenue of Ky. v. Davis,*
  553 U.S. 328 (2008) .................................................... 15, 26

*Edgar v. MITE Corp.,*
  457 U.S. 624 (1982) ............................................................ 40

*Exxon Corp. v. Governor of Maryland,*
  437 U.S. 117 (1978) ............................................................ 16

*Friedman v. AARP, Inc.,*
  855 F.3d 1047 (9th Cir. 2017) .......................................... 20

*General Motors Corp. v. Tracy,*
  519 U.S. 278 (1997) ............................................................ 15

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.,*
  63 F.4th 747 (9th Cir. 2023) ............................................ 20

*Granholm v. Heald,*
  544 U.S. 460 (2005) ............................................................ 26

*Guy v. City of Baltimore,*
  100 U.S. 434 (1879) ............................................................ 25

*H. P. Hood & Sons, Inc. v. Du Mond,*
  336 U.S. 525 (1949) ............................................................ 40

*Hughes v. Oklahoma*,
441 U.S. 322 (1979) ............................................................. 33

*In re Focus Media Inc.*,
387 F.3d 1077 (9th Cir. 2004) ........................................... 23

*Int'l Franchise Ass'n, Inc. v. City of Seattle*,
803 F.3d 389 (9th Cir. 2015) .............................................. 20

*IPPA v. Bonta*,
No. 221CV09940CASAFMX, 2022 WL 1042561 (C.D. Cal. Feb.
28, 2022) ............................................................................ 28

*Kashem v. Barr*,
941 F.3d 358 (9th Cir. 2019) .............................................. 46

*Kolender v. Lawson*,
461 U.S. 352 (1983) ............................................................. 46

*Lair v. Bullock*,
697 F.3d 1200 (9th Cir. 2012) ........................................... 23

*McClellan v. I-Flow Corp.*,
776 F.3d 1035 (9th Cir. 2015) ........................................... 65

*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007) ............................................................. 60

*Monterey Mech. Co. v. Wilson*,
125 F.3d 702 (9th Cir. 1997) .............................................. 54

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable
Operating Co.*,
22 F.3d 546 (4th Cir. 1994) ................................................ 54

*N. Am. Meat Inst. v. Becerra,*
  420 F. Supp. 3d 1014 (C.D. Cal. 2019), *aff'd*, 825 F. App'x 518 (9th Cir. 2020) ................................................................... 30

*Nelson v. NASA,*
  530 F.3d 865 (9th Cir. 2008) ............................................. 53

*NPPC v. Ross,*
  6 F.4th 1021 (9th Cir. 2021), *aff'd*, 143 S. Ct. 1142 (2023).......... passim

*Or. Waste Sys., Inc. v. Dep't of Env't Quality of State of Or.,*
  511 U.S. 93 (1994) ............................................................. 26

*Pike v. Bruce Church, Inc.,*
  397 U.S. 137 (1970) ....................................................... passim

*Pure Wafer, Inc. v. City of Prescott,*
  14 F. Supp. 3d 1279 (D. Ariz. 2014) ................................. 54

*Ramos v. Wolf,*
  975 F.3d 872 (9th Cir. 2020) ............................................. 57

*S. Dakota v. Wayfair, Inc.,*
  138 S. Ct. 2080 (2018) ....................................................... 26

*S.D. Myers, Inc. v. City & Cnty. of San Francisco,*
  253 F.3d 461 (9th Cir. 2001) ....................................... 28, 34

*Sam Francis Found. v. Christies, Inc.,*
  784 F.3d 1320 (9th Cir. 2015) ........................................... 25

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency,*
  535 U.S. 302 (2002) ........................................................... 55

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.,*
  550 U.S. 330 (2007) ..................................................... 28, 29

*United States v. California,*
  921 F.3d 865 (9th Cir. 2019) ............................................................. 65

*United States v. Shetler,*
  665 F.3d 1150 (9th Cir. 2011) ........................................................... 46

*Univ. of Hawai'i Prof. Assembly v. Cayetano,*
  183 F.3d 1096 (9th Cir. 1999) ........................................................... 56

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ................................................................................ 23

## **Statutes**

7 U.S.C. § 181 ....................................................................................... 65

7 U.S.C. § 192(b) .................................................................................. 65

21 U.S.C. § 601 ......................................................................... 18, 19, 37

28 U.S.C. § 1291 ..................................................................................... 5

28 U.S.C. § 1292(a)(1) ............................................................................ 5

28 U.S.C. § 1331 ..................................................................................... 5

28 U.S.C. § 1441(a) ................................................................................. 5

Cal. Bus. & Prof. Code § 17200 ...................................................... 9, 39

Cal. Bus. & Prof. Code § 17203 .......................................................... 39

Cal. Bus. & Prof. Code § 17206 ............................................................ 9

Cal. Health & Safety Code § 25990 ............................................. passim

Cal. Health & Safety Code § 25991 ........................................... 8, 37, 48

Cal. Health & Safety Code § 25993 ............................................ 7, 8, 9, 46

Cal. Health & Safety Code § 25994 ......................................................... 6

Cal. Penal Code Ann. § 27(a)(1) ...................................................... 49, 51

Cal. Penal Code Ann. § 182 .............................................................. 49, 51

Cal. Penal Code Ann. § 184 .............................................................. 49, 51

U.S. Const. art. I, § 8, cl. 3 ................................................................... 25

U.S. Const. art. IV § 2 cl. 1 .................................................................. 62

## Regulations

Cal. Code Regs. tit. 3, § 1322.2 ...................................................... 49, 50

Cal. Code Regs. tit. 3, §§ 1322.6–.7 ..................................................... 38

## Other Authorities

22-Z Cal. Regulatory Notice Reg. 594 (May 28, 2021) ........................... 28

2008 Cal. Legis. Serv. Prop. 2 ......................................................... 6, 28

2018 Cal. Legis. Serv. Prop. 12 .............................................................. 7

CDFA/AHFSS, *Animal Care Program* (March 5, 2021),
    https://www.cdfa.ca.gov/AHFSS/pdfs/Prop_12_FAQ_March_2021.
    pdf .......................................................................................... 31, 32

CDFA, ANIMAL CONFINEMENT INITIAL STATEMENT OF
    REASONS (May 28, 2021),
    https://www.cdfa.ca.gov/ahfss/pdfs/regulations/AnimalConfineme
    ntISOR_05252021.pdf ............................................................... 35, 36

CDFA, ANIMAL CONFINEMENT FINAL STATEMENT OF
  REASONS (Aug. 30, 2022),
  www.cdfa.ca.gov/AHFSS/pdfs/FSOR_Final_8.30.22.pdf .....................36

*Ct. Order, Cal. Hisp. Chambers of Com. v. Ross*, No. 34-2021-
  80003765 (Super. Ct. Sacramento County, Cal. June 15, 2023)...12, 19

*Engage*, BLACK'S LAW DICTIONARY (11th ed. 2019) .................................47

## INTRODUCTION

Appellant Iowa Pork Producers Association ("IPPA")[1] challenges the legality and constitutionality of Proposition 12, a California state law dictating how pork sold to California consumers must be farmed nationwide. In short, Proposition 12 requires pig farmers—*on a nationwide basis*—to raise breeding pigs using vague and arbitrary confinement techniques that conflict with traditional and time-tested farming practices used for generations to feed the Nation. As these confinement techniques are untethered to reality and lack any scientific support, their enforcement would leave the entire pork supply chain in a state of emergency and inflict irreparable harm to not only producers, processors, retailers, and pork consumers nationwide, but also to the wellbeing of breeding pigs currently being raised.

This isn't the first time this Court has encountered a challenge to Proposition 12; in fact, last term, the Supreme Court evaluated a different challenge to Proposition 12, pursued by the National Pork Producers Council ("NPPC") and made exclusively under the Supreme

[1] Plaintiff IPPA is a trade association with more than 4,000 affiliated and associate members that produce, pack, and sell pork into California.

Court's "dormant Commerce Clause" precedents. *See NPPC v. Ross*, 143 S. Ct. 1142 (2023). In affirming dismissal there, however, the Supreme Court noted that NPPC failed to assert essential legal theories; and as to the claims it did assert, it failed to include sufficient allegations to state those claims. Specifically, although a substantial amount of the Supreme Court's dormant Commerce Clause precedents implicate regulations that are discriminatory (i.e., benefit home state commerce at the expense of other states), NPPC did not include such a claim—in fact, it *conceded* that Proposition 12 was nondiscriminatory. *Id.* at 1153. The opposite is true here; in this case, IPPA's core claim expressly alleges that Proposition 12 is discriminatory, which was not even at issue in *NPPC v. Ross*.

NPPC's own repudiation of any allegation of discrimination also undermined its effort to show that Proposition 12 imposed too substantial of a burden on interstate commerce in violation of *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) and its progeny. And NPPC failed to include any sufficient allegations to assert a valid challenge under *Pike*. Once again, precisely the opposite is true here. In addition to IPPA's allegations establishing that Proposition 12 is discriminatory, IPPA also

2

included substantial allegations to illustrate how Proposition 12 violates *Pike*.

Any purported similarity in claims between this case and *NPPC v. Ross* ceases there, however. IPPA also challenged Proposition 12 and requested injunctive relief on the basis that it violates its members' due process rights as applied to their conduct in stewarding the Nation's pork supply. Whether Proposition 12 violates producers' due process rights under the Constitution has *never* been raised and is a constitutional principle that the plurality in *NPPC v. Ross* noted as a potential avenue to resolve disputes about the reach of a single State's power. *NPPC* at 1156.

Finally, while *NPPC v. Ross* involved just a motion to dismiss, this case involves a preliminary injunction as well. As a result, IPPA substantiated its allegations with evidence, demonstrating that it is likely to succeed on the merits of its claims, that it will suffer irreparable harm in the absence of an injunction, and that the *nationwide* harm to the public that enforcement of Proposition 12 will cause during the pendency of this litigation *far* outweighs any trivial benefit.

Simply put, this case raises constitutional questions the Supreme Court prompted in *NPPC v. Ross*, which are now ripe for this Court to review. This Court should reverse the judgment of the district court and preliminarily enjoin enforcement of Proposition 12. The consequences of failing to do so are drastic. If this Court endorses an individual state's regulation of an out-of-state industry (especially one that is discriminatory in nature) based on the state's own sense of what is "moral," it is difficult to see where that road ends. While this case involves pork, the next case could involve any food or service imaginable—goods or services that individual states have developed entire robust economies around. And if moral positions can drive the regulation of out-of-state industry, why couldn't future regulation be based on minimum wage policies, or employees' immigration status, or any other hot-button social issue of the day? The Framers prohibited precisely this type of discriminatory and overly onerous out-of-state regulation, and this Court should enjoin Proposition 12 accordingly.

At the *very least*, this Court should reverse the district court's dismissal, as IPPA's complaint plainly states a claim not only under several dormant Commerce Clause theories, but also under the Due

Process Clause, the Privileges and Immunities Clause, and preemption principles. Failure to correct the district court's course in favor of IPPA in this instance will pave the way for a trade war between the sovereign states based on disagreements on moral or ethical principles.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this matter under 28 U.S.C. § 1331 and 28 U.S.C. § 1441(a). IPPA timely filed its notice of appeal on March 30, 2022, arising from the district court's orders filed on February 28, 2022, with final judgment entered on March 29, 2022.

This Court has jurisdiction to review the denial of a preliminary injunction under 28 U.S.C. § 1292(a)(1). This Court also has jurisdiction to review a dismissal of a complaint under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.    Did the district court err in denying IPPA's motion for preliminary injunction when IPPA presented uncontroverted evidence of the discriminatory nature and impact of Proposition 12, as well as the improper nationwide regulation of the Nation's pork industry in a manner that violates producers' due process rights?

2.      Did the district court err in dismissing each of IPPA's claims by failing to accept all of IPPA's allegations as true and otherwise improperly considering the merits of the case at the motion to dismiss stage?

## PERTINENT STATUTES AND REGULATIONS

Pursuant to Circuit Rule 28-2.7, pertinent statutes, regulations, and rules are contained in the separate addendum filed concurrently herewith.

## STATEMENT OF THE CASE

## I.     California's Regulation of the Pork Industry—Propositions 2 & 12

In November 2008, California passed Proposition 2, a ballot initiative adding §§ 25990–25994 to the California Health and Safety Code. 2008 Cal. Legis. Serv. Prop. 2 ("Proposition 2"); Cal. Health & Safety Code §§ 25990–25994. Relating to the "confinement of farm animals," Proposition 2 prohibited *California farmers* from tethering or confining pregnant pigs in a way that prevented them from "[l]ying down, standing up, and fully extending [their] limbs," or from "[t]urning around freely." *See* Cal. Health & Safety Code §§ 25990, 2599l(b). Proposition 2 gave California pork producers *over six years* to comply

with these confinement requirements, with an effective date of January 1, 2015. *See id.* § 25990. At the time, only in-state pork producers were subject to these requirements. *Id.* § 25990(a).

Ten years later, California passed Proposition 12. 2018 Cal. Legis. Serv. Prop. 12 ("Proposition 12"); Cal. Health & Safety Code §§ 25990–25993.1. According to the ballot language, Proposition 12 was intended "to prevent animal cruelty by phasing out extreme methods of farm animal confinement, which also threaten the health and safety of California consumers, and increase the risk of foodborne illness and associated negative fiscal impacts on the State of California." *See* 2018 Cal. Legis. Serv. Prop. 12 § 1. Remarkably, Proposition 12 reached beyond the borders of California, now banning a seller from "knowingly engag[ing] in the sale within the state" of pork meat that the seller "knows or should know is the meat of a covered animal who was confined in a cruel manner, *or is the meat of the immediate offspring of a covered animal that was confined in a cruel manner.*" Cal. Health & Safety Code § 25990(b)(2) (emphasis added).

Proposition 12 provided two definitions for "[c]onfined in a cruel manner" as related to pork: "[c]onfining a covered animal in a manner

that prevents the animal from lying down, standing up, fully extending the animal's limbs, or turning around freely," *id.* § 25991(e)(1) (the "turnaround requirements"), and as of December 31, 2021, "confining a breeding pig with less than 24 square feet of usable floorspace per pig," *id.* § 25991(e)(3) (the "square footage requirements"). Further, Proposition 12 defined a "sale," stating that a "sale shall be deemed to occur at the location where the buyer takes physical possession of" the noncompliant meat. *Id.* § 25991(o).

Proposition 12 also had an extremely truncated enforcement timeline, especially as compared to what California imposed on its own in-state producers with Proposition 2. Whereas Proposition 2 allowed in-state producers *six years* to comply with its provisions (November 4, 2008, to January 1, 2015), Proposition 12 was designed to take effect for out-of-state producers immediately. The turnaround requirements were to take effect on December 19, 2018—giving out-of-state producers **a mere six weeks** to come into compliance (as opposed to the prior five-year benefit provided to in-state producers). *See* Cal. Health & Safety Code §§ 25990–25993.1. And with respect to Proposition 12's square footage requirements, they were to take effect on December 31, 2021,

approximately three years after its approval; in effect, this means that in-state producers had nine years to recover from the initial financial and operational impact of the turnaround requirements before imposing the square footage requirements, while out-of-state producers had to suffer the financial and operational burden of implementing them both within three years.

Proposition 12 bears significant consequences for noncompliance. Any person who violates Proposition 12 is criminally guilty of a misdemeanor punishable by a fine of up to $1,000 and up to 180 days imprisonment. *Id.* § 25993(b). Moreover, violating Proposition 12 is a per se violation of California's unfair competition laws, which carry crippling civil penalties and invites injunctive relief to be pursued not only by any local prosecutor in California, but also by private individuals alleging harm by an unlawful sale of whole pork meat into California. *Id.* § 25993(b) (citing Cal. Bus. & Prof. Code § 17200); *see also* Cal. Bus. & Prof. Code § 17206.

## II.    Procedural History—District Court Proceedings

On November 9, 2021, plaintiff IPPA, on behalf of its members, filed the present suit in Fresno Superior Court against various California

officials tasked with enforcing Proposition 12 ("California"). *See* 1-ER-2. On November 16, 2021, California removed the case to the United States District Court for the Eastern District of California. *See* 1-ER-3. On December 16, 2021, IPPA filed its first amended complaint seeking declaratory and injunctive relief ("FAC"). 4-ER-504. The FAC alleged that Proposition 12 was unconstitutional and otherwise unlawful because it (1) it violated IPPA's members' due process rights under the Due Process Clause; (2) it violated the Privileges and Immunities Clause; (3) it was preempted by Packers and Stockyards Act; (4) and that it violated the dormant Commerce Clause. 4-ER-504–544.

On December 16, 2021, IPPA filed a motion for a preliminary injunction seeking to enjoin enforcement of Proposition 12. *See* 1-ER-3. On December 27, 2021, the case was transferred to the Central District of California. 1-ER-3. On January 3, 2022, California filed a motion to dismiss the FAC. 1-ER-28.

On February 28, 2022, the district court held a hearing on both the motion to dismiss and the motion for preliminary injunction. *See* 1-ER-29. The district court denied IPPA's motion for a preliminary injunction and granted California's motion to dismiss. *See* 1-ER-2–53. With respect

to the motion for preliminary injunction, the district court rejected IPPA's arguments regarding the likelihood of success on the merits and did not consider the other injunctive factors. 1-ER-2–27. With respect to the motion to dismiss, the Court ordered dismissal of each of IPPA's claims for the same reasons it denied the preliminary injunction. 1-ER-28–53.

## III. Procedural History—*NPPC v. Ross*

### A. Stay of This Appeal

IPPA appealed both the denial of its motion for preliminary injunction and the dismissal. On April 29, 2022, California moved to stay appellate proceedings pending the outcome of the *NPPC v. Ross* case, which was then pending before the Supreme Court, and involved dismissal of a dormant Commerce Clause challenge to Proposition 12 based only upon a per se application of the "extraterritorial doctrine" and the substantial burden analysis set forth in *Pike v. Bruce Church*, 397 U.S. 137 (1970). ECF No. 8. Over IPPA's opposition due to the substantial difference in the theories advanced and procedural posture, this Court granted the motion and stayed these proceedings. ECF No. 11.

Consequently, for the past year, this appeal had been stayed pending the Supreme Court's decision in *NPPC v. Ross*. *See* ECF No. 11.

## B.    Stay of Proposition 12 in State Court

In a parallel state lawsuit brought by other entities challenging Proposition 12, a California state court entered a prohibitory writ of mandate staying enforcement of the square footage requirements for Proposition 12 for 180 days following implementation of the final regulations for Proposition 12, which at that point in time, had yet to be issued. *See Cal. Hisp. Chambers of Com. v. Ross,* No. 34-2021-80003765 (Super. Ct. Sacramento County, Cal. Nov. 28, 2022) (the "CHCC Order"). *See* 2-ER-62–72. This stay of enforcement was extended by agreement permitting the legal sell through of conventional whole pork meat within California up to and including July 1, 2023, and permitting any conventional whole pork meat already processed and in California to continue to be sold without risk of enforcement through December 31, 2023. *See Ct. Order, Cal. Hisp. Chambers of Com. v. Ross*, No. 34-2021-80003765 (Super. Ct. Sacramento County, Cal. June 15, 2023). At that time, the CHCC Order and its case will be jointly dismissed. *Id.*

## C. *NPPC v. Ross*

On May 11, 2023, the Supreme Court issued its decision in *NPPC v. Ross*. 143 S. Ct. 1142 (2023). The Supreme Court affirmed, holding that NPPC failed to state a claim that Proposition 12 violated the dormant Commerce Clause under the limited legal theories NPPC decided to advance. *Id.* at 1165. Notably, the Court specifically recognized that for purposes of the dormant Commerce Clause claim, NPPC had "disavow[ed] any discrimination-based claim, conceding that Proposition 12 imposes the same burdens on in-state pork producers that it imposes on out-of-state ones." *Id.* at 1153. Given there was no discrimination allegation to consider, the Supreme Court turned to NPPC's other two theories for why Proposition 12 violated the dormant Commerce Clause: (1) a per se application of what NPPC called the "extraterritoriality doctrine," and (2) the substantial burden balancing test articulated in *Pike v. Bruce Church. Id.* at 1153–59.

As for the first, the Court rejected NPPC's suggested per se application of the "extraterritoriality doctrine," finding that such an application—at least on a per se basis—extended the dormant Commerce Clause too far. *Id.* at 1154–57, 1165–66; *see also id.* at 1167 (Roberts, C.J.,

concurring in part and dissenting in part) ("I also agree . . . that our precedent does not support a per se rule against state laws with 'extraterritorial' effects.")).

As for the second, NPPC argued that under *Pike*, "a court must at least assess 'the burden imposed on interstate commerce' by a state law and prevent its enforcement if the law's burdens are 'clearly excessive in relation to the putative local benefits.'" *Id.* at 1157. NPPC then provided a list of reasons why the benefits Proposition 12 secures for Californians did not outweigh the costs it imposed on out-of-state economic interests. *Id.*

But in Part IV-A of the opinion, a majority of five Justices determined that NPPC had overstated the extent to which *Pike* "depart[ed]" from the antidiscrimination principles lying at the heart of the dormant Commerce Clause. *Id.* at 1157–59. The majority reasoned that *Pike*—which involved a state law that violated the dormant Commerce Clause by requiring cantaloupes grown in the state of Arizona to be processed and packed within the state of Arizona—was actually a discrimination case, because the state law at issue required business operations to be performed in the state that could be more efficiently

performed elsewhere. *Id.* Consequently, the "'practical effect[s]' of the order in operation thus revealed a discriminatory purpose—an effort to insulate in-state processing and packaging businesses from out-of-state competition." *Id.* at 1158. Consequently, the majority reasoned that under *Pike*, a law that was facially neutral could still violate the dormant Commerce Clause if the "law's practical effects . . . disclose[d] the presence of a discriminatory purpose." *Id.* Applying those principles to the case at hand, since NPPC had disavowed any claim that Proposition 12 discriminated on its face or that its "practical effects in operation would disclose purposeful discrimination against out-of-state business," NPPC's claim failed. To be sure, even that portion of the opinion recognized that the Supreme Court "has left the 'courtroom door open' to challenges premised on 'even nondiscriminatory burdens,'" *id.* at 1158 (quoting *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 353 (2008)), and that "'a small number of our cases have invalidated state laws . . . that appear to have been genuinely nondiscriminatory,'" *id.* (quoting *General Motors Corp. v. Tracy*, 519 U.S. 278, 298 n.12 (1997)). Even so, the Court concluded that as NPPC had plead its claim, it "f[e]ll[] well outside *Pike*'s heartland," which was "not an auspicious start." *Id.* at 1158-59.

The Court then moved on to the question of what to do with *Pike* in this specific case; it is on that question that the opinion deeply fractured. Three Justices concluded that *Pike* should be dead letter, asserting that it inappropriately asked judges to engage in a balancing act that no court was adequately equipped to perform. *Id.* at 1159–61 (Part IV-B). Four Justices determined that even if the Court were to apply the *Pike* test as NPPC had articulated it, NPPC's specific allegations in the complaint failed to adequately allege a necessary prerequisite—a sufficient burden on interstate commerce—as Proposition 12 simply did not meet the level for a substantial burden as described in *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117 (1978). *Id.* at 1161–63 (Part IV-C). Specifically, that plurality determined that NPPC could segregate their operations to ensure pork products entering California meet Proposition 12's standards or could simply withdraw from California's market all-together; and while this may increase costs on pork producers, such harm was merely harm to "some producers' favored 'methods of production'" instead of a burden on interstate commerce for purposes of the dormant Commerce Clause. *Id.* Consequently, the plurality concluded that NPPC

failed to "plausibly" suggest a substantial harm to interstate commerce. *Id.*

Four Justices dissented. While they agreed the application of a per se rule against state laws with extraterritorial effects was inappropriate, they explained that *Pike* was still good law to ensure that there be "free private trade in the national marketplace" (and, to be clear, that holding represented the view of six justices). *Id.* at 1169 (Roberts, C.J., concurring in part and dissenting in part). Applying *Pike*, the dissent concluded that because NPPC had "identif[ied] broader, market-wide *consequences* of compliance" with Proposition 12, NPPC had stated "economic harms that our precedents have recognized can amount to a burden on interstate commerce." *Id.* at 1169.[2]

In sum, while the Court's application was deeply fractured, a six-Justice majority "affirmatively retain[ed] the longstanding *Pike*

_____

[2] In response to the dissent, three Justices disagreed with the contemplation of harm to the interstate market, contending it was merely a rearticulation of the per se rule and that it would prevent California from regulating itself, purely because of its position within the broader national market, and that it was taking into account harms that were not even economic in nature as *Pike* required. *NPPC*, 143 S. Ct. at 1163–64 (Part IV-D).

balancing test for analyzing dormant Commerce Clause challenges to state economic regulations." *Id.* at 1172 (Kavanaugh, J., concurring in part and dissenting in part). In applying that standard **to NPPC's specific allegations**, however, two schools of thought emerged: four Justices (including two of the six holding that *Pike* should be retained) concluded NPPC's allegations in the complaint had failed to allege sufficient burden on interstate commerce, which was a prerequisite before even reaching the balancing portion of the *Pike* test. And four Justices (all of whom held that *Pike* should be retained) found that NPPC had "identif[ied] broader, market-wide consequences of compliance" with Proposition 12, and thus had stated "economic harms that our precedents have recognized can amount to a burden on interstate commerce." *Id.* at 1169 (Roberts, C.J., concurring in part and dissenting in part).

### D.  Post-*NPPC v. Ross*

On June 16, 2023, California agreed to a limited modification of the CHCC Order with narrow relief to the pork industry applying only to noncompliant whole pork meat that as of July 1, 2023, is in the possession of an "end user" or "pork distributor," or is already on the premises of a Federal Meat Inspection Act-inspected establishment as set forth in 21

U.S.C. § 601. This stay of enforcement was extended by agreement permitting the legal sell through of conventional whole pork meat within California up to and including July 1, 2023, and permitting any conventional whole pork meat already processed and in California to continue to be sold without risk of enforcement through December 31, 2023. *See Ct. Order, Cal. Hisp. Chambers of Com. v. Ross*, No. 34-2021-80003765 (Super. Ct. Sacramento County, Cal. June 15, 2023). At that time, the CHCC Order and its case will be jointly dismissed. *Id.*

Consequently, there is *no* relief for pork producers who have remained unable to convert their operations to become compliant with Proposition 12. The CHCC limited modification order provides no prohibition precluding the California Attorney General's office, the California Department of Food and Agriculture ("CDFA"), local prosecutors, or private individuals from pursuing enforcement of Proposition 12 after July 1, 2023, and the imminent likelihood of enforcement will lead to halted sales, pork shortages within California and overall national impact as represented by the evidence submitted by

IPPA to the district court. The imminent risk of civil and criminal enforcement is finally a reality.[3]

## STANDARD OF REVIEW

"Denial of a motion for a preliminary injunction is reviewed for abuse of discretion and the underlying legal principles de novo." *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 398 (9th Cir. 2015). Similarly, the Court reviews "a district court's ruling on a motion to dismiss de novo." *Friedman v. AARP, Inc.*, 855 F.3d 1047, 1051 (9th Cir. 2017) (quotation omitted). "In determining the adequacy of the complaint, [the Court] accept[s] all factual allegations as true and view[s] them in the light most favorable to [the p]laintiffs." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 763 (9th Cir. 2023). While generally the Court "may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion" documents "may be incorporated by reference into a complaint if the plaintiff refers extensively to the

---

[3] While the CHCC Order textually only applies to the square footage requirements of Proposition 12, the CHCC Order was largely interpreted by the industry as preventing enforcement of the turnaround provisions of Proposition 12 as well. ECF No. 18.

document or the document forms the basis of the plaintiff's claim." *Friedman*, 855 F.3d at 1051 (quotation omitted).

## SUMMARY OF THE ARGUMENT

The district court should have granted a preliminary injunction enjoining Proposition 12. First, IPPA is likely to succeed on the merits of its dormant Commerce Clause and Due Process claims. With respect to the dormant Commerce Clause, Proposition 12 discriminates against out-of-state pork producers by treating them less favorably than it treated in-state producers. Furthermore, even if there was no such direct discrimination, Proposition 12 fails the *Pike* test as the burdens on interstate commerce inflicted by Proposition 12 are clearly excessive to any conceivable benefit to California. This is particularly the case where the entire impact of Proposition 12 will be felt outside of California's borders. And as for Due Process, Proposition 12—as a criminal statute— is unconstitutionally vague because it is entirely unclear in breadth, as the criminal action therein ("engaging" in a "sale") conceivably applies up and down the supply chain to anyone involved, at all, in the interstate pork market.

With respect to the other factors in the preliminary injunction analysis, although the district court did not analyze them, they each weigh in favor of a preliminary injunction. IPPA faces irreparable harm as Proposition 12 threatens the entire interstate pork supply chain, and the balance of equities lies in favor of IPPA as Proposition 12 will wreak economic harm on its members and the public at large.

Second, the district court erred when it *dismissed* all of IPPA's claims. As for the dormant Commerce Clause claims and Due Process claims, the district court erred for the same reasons it erred in denying IPPA's motion to dismiss. However, the district court *particularly* erred by not fairly crediting all the allegations in IPPA's complaint and by using a standard more akin to summary judgment by discrediting IPPA's allegations of discriminatory impact. Similarly, the district court also erred in dismissing IPPA's claim under the Privileges and Immunities Clause by failing to credit the supported allegations alleging the discriminatory impact that Proposition 12 carries. Finally, IPPA sufficiently pleaded its preemption claim under the Packers and Stockyards Act. The district court failed to credit IPPA's allegations in finding that compliance with federal law, and Proposition 12, is

impossible (or at the very least, that Proposition 12 stands as a significant obstacle to federal law).

Thus, this Court should reverse the district court's dismissal of IPPA's case. Further, this Court should reverse the district court's denial of IPPA's motion for preliminary injunction and direct that the district court enjoin the enforcement of Proposition 12 during the pendency of this case.

## ARGUMENT

### I. The District Court Should Have Granted a Preliminary Injunction.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). To establish a likelihood of success, a plaintiff only needs show that there is a "fair chance of success." *In re Focus Media Inc.*, 387 F.3d 1077, 1086 (9th Cir. 2004). The "fair chance of success" standard "does not require [the plaintiff] to show that it is more likely than not that they will win on the merits." *Lair v. Bullock*, 697 F.3d 1200, 1204 (9th Cir. 2012) (quotation

omitted). Rather, the plaintiff "must show that there is a substantial case for relief on the merits." *Id.* (quotation omitted).

For the reasons set forth below, this Court should reverse the district court's dismissal of IPPA's claims and stay enforcement of Proposition 12 during the pendency of this litigation.

## A. IPPA is likely to succeed on the merits of its Commerce Clause and Due Process Clause claims.

With respect to the likelihood of success element, IPPA primarily offered its Commerce Clause and Due Process Clause claims as the basis for the preliminary injunction. The district court incorrectly concluded that the IPPA was unlikely to succeed on either of those claims, and it based its denial of the preliminary injunction on this element of the test. This Court should reverse that conclusion with respect to both claims.

### 1. IPPA has a fair chance of success on its Commerce Clause claims.

The United States is now entering a new phase where individual states are attempting to regulate conduct of other states based upon moral or policy reasons specific to that state. But this runs afoul of the body of jurisprudence interpreting the Commerce Clause of the Constitution. The Commerce Clause grants Congress the exclusive

authority "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. But "the Clause also contain[s] a further, negative command, one effectively forbidding the enforcement of certain state [economic regulations] even when Congress has failed to legislate on the subject." *NPPC*, 143 S. Ct. at 1152 (quotation omitted). Referred to as the dormant Commerce Clause, this doctrine explains that "state laws offend the Commerce Clause when they seek to 'build up . . . domestic commerce' through 'burdens upon the industry and business of other States[.]'" *Id.* (quoting *Guy v. City of Baltimore*, 100 U.S. 434, 443 (1879)).

States who offend the Commerce Clause in this manner violate the core principle of the Supreme Court's jurisprudence—the antidiscrimination principle. *Id.* ("[T]his antidiscrimination principle lies at the 'very core' of [the Supreme Court's] dormant Commerce Clause jurisprudence." (quotation omitted)). And to prevent such discrimination and "ensure[] that state autonomy over local needs does not inhibit the overriding requirement of freedom for the national commerce," *Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1323 (9th Cir. 2015) (quotation omitted), there are "two primary principles that mark the

boundaries of a state's authority to regulate interstate commerce": "First, state regulations may not discriminate against interstate commerce; and second, States may not impose undue burdens on interstate commerce." *S. Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2090–91 (2018).

The Supreme Court has emphasized the importance of the antidiscrimination core principle within the Commerce Clause, stating that "[s]tate laws that discriminate against interstate commerce face 'a virtually per se rule of invalidity.'" *Id.* (quoting *Granholm v. Heald*, 544 U.S. 460, 476 (2005)); *Brown–Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 578–79 (1986). Such a law "will survive only if it 'advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives[.]'" *Davis*, 553 U.S. at 353 (quoting *Or. Waste Sys., Inc. v. Dep't of Env't Quality of State of Or.,* 511 U.S. 93, 99 (1994)).

Further, "even nondiscriminatory burdens on commerce may be struck down on a showing that those burdens clearly outweigh the benefits of a state or local practice." *Davis*, 553 U.S. at 353 (citing *Pike*, 397 U.S. at 142); *see also NPPC*, 143 S. Ct. at 1168 (Roberts, C.J., concurring in part and dissenting in part) ("As a majority of the Court

agrees, *Pike* extends beyond laws either concerning discrimination or governing interstate transportation."); *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 948 (9th Cir. 2013) (even if "a statute has only indirect effects on interstate commerce and regulates evenhandedly," it still may violate the dormant Commerce Clause if "the State's interest is [il]legitimate" or if "the burden on interstate commerce clearly exceeds the local benefits.").

Proposition 12 violates the dormant Commerce Clause in both respects: it violates the antidiscrimination core principle by discriminating against—if not directly targeting—out-of-state pork producers; and, even if this Court concludes Proposition 12 does not directly discriminate, Proposition 12 still imposes a substantial burden on the interstate pork market and supply chain that is clearly excessive in relation to the putative local benefits it provides.

> ### a.     *Proposition 12 discriminates against out-of-state commerce.*

Proposition 12 discriminates against out-of-state commerce in several material ways. "Discrimination in this context means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Id.* (quotation omitted). Laws motivated

by "simple economic protectionism" render the law per se unconstitutional. *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338–39 (2007). Furthermore, such discrimination can be shown by analyzing the "practical effects" of Proposition 12. *S.D. Myers, Inc. v. City & Cnty. of San Francisco*, 253 F.3d 461, 469 (9th Cir. 2001).

The manner in which California has regulated the pork industry illustrates Proposition 12's discrimination against out-of-state producers. Proposition 2 imposed turnaround requirements on all ***in-state*** producers in 2015. 2008 Cal. Legis. Serv. Prop. 2. Perhaps not surprisingly, imposing those regulations had the negative, practical effect of limiting in-state pork producers' ability to compete with out-of-state producers. 22-Z Cal. Regulatory Notice Reg. 594 (May 28, 2021); *see also IPPA v. Bonta*, No. 221CV09940CASAFMX, 2022 WL 1042561, at *3 (C.D. Cal. Feb. 28, 2022) ("The CDFA has acknowledged that, as a result of Proposition 12, in-state farms will find it more costly to compete with farms outside of the State . . . that do not have the same animal confinement standards" (quotation omitted)). And as far as the constitutional analysis goes (at least in terms of the federal constitutional

provisions involved here) no harm, no foul. California certainly has the prerogative to impose regulations on its own producers that end up being detrimental to its own in-state producers in the marketplace.

But what it cannot then do—a decade later—is target **out-of-state** producers and harm them economically to the direct benefit of the in-state producers. Again, the state of play at the enactment of Proposition 12 was that California had already regulated its own in-state producers (years earlier) and the economic effects of that were already incorporated into the marketplace. If those regulations and their effects were too onerous on California producers, it could have rescinded them. But instead, California chose the more onerous—and unconstitutional—path: it explicitly targeted out-of-state producers under the guise of "leveling the playing field." That excuse doesn't work here. California was the one who set the regulatory market—and the in-state producers' place in it— prior to the enactment of Proposition 12. It has no right to then directly discriminate against out-of-state producers to temper the economic ill effects it foisted upon its own producers. This type of "simple economic protectionism" renders the law per se unconstitutional. *See Haulers*, 550 U.S. at 338-39.

As if that direct discrimination of out-of-state producers were not problematic enough, the timelines under which California demanded compliance by out-of-state producers—when compared with in-state producers—leaves no doubt as to Proposition 12's discriminatory nature. Proposition 2 gave in-state producers **six years** to come into compliance with its turnaround provisions. Cal. Health & Safety Code § 25990. Contrast that with Proposition 12, which gave out-of-state producers **less than six weeks** to comply with the turnaround requirements (and just three years for the square-footage requirements). *Id.* Not only is that distinction facially discriminatory, but it also has harmful practical implications. This shortchanging in "lead time" will force out-of-state producers into a Hobson's choice of culling a significant amount of their breeding pigs to make sufficient room for spacing restrictions or expending millions of dollars (if even possible) to completely reconstruct their facilities in mere weeks. And, of course, these are consequences, expenditures, and burdens that were never forced upon in-state producers. *See N. Am. Meat Inst. v. Becerra*, 420 F. Supp. 3d 1014, 1028 n.7 (C.D. Cal. 2019), *aff'd*, 825 F. App'x 518 (9th Cir. 2020) (reasoning

that any difference in lead in time for compliance with Proposition 12 could indicate discriminatory effect on out-of-state commerce).[4]

The discriminatory impact of Proposition 12 doesn't stop there. In California's implementation of the regulations, it continues to favor in-state producers by allowing them the ability to "sell through" its inventoried and non-compliant pork without providing such an opportunity to out-of-state producers.[5] Specifically, the CDFA has issued answers to several "Frequently Asked Questions" in an attempt to try to clarify how Proposition 12 would be implemented. *See* CDFA/AHFSS,

---

[4] California cannot escape this argument by suggesting that the "new" 24-square-footage requirement imposes costs on everyone—in-state and out-of-state alike. The record demonstrates the discriminatory effect of that provision, illustrating it is far easier and cheaper for California producers than it is for out-of-state producers to implement the square footage requirements. California producers are only required to shift to the 24-square footage requirement from an already existing 20-square foot requirement, resulting in an estimated 15% increase in capital costs. 3-ER-202–03, 3-ER-415. However, the rest of the country typically houses breeding pigs in 14 or 16-square foot enclosures, and thus the shift to a 24-square foot enclosure is estimated to result in a capital cost increase of 50% for Iowa producers. 3-ER-203.

[5] Although the regulations were enacted after the district court denied IPPA's motion for preliminary injunction and thus IPPA did not directly challenge them below (since it could not), they are proper to be considered in analyzing the discriminatory impact of Proposition 12. *See, e.g., Alpha Phoenix Industries, LLC v. SCI International, Inc.*, 666 F. App'x 598 (9th Cir. 2016); *see also Cristobal v. Siegel*, 26 F.3d 1488, 1493 (9th Cir. 1994).

*Animal Care Program* (March 5, 2021), https://www.cdfa.ca.gov/AHFSS/pdfs/Prop_12_FAQ_March_2021.pdf. One of the issues raised was whether current inventory already in stock by December 31, 2021—the date the square footage requirements took effect—would need to be discarded or could be sold. The CDFA stated that any pork already in inventory on December 31, 2021, would still be legal to sell in California. *Id.* But the CDFA did not include any corresponding sell-through option for the *turnaround* requirements. *Id.* Recall that in-state producers were the only ones already compliant with the turnaround requirements because of Proposition 2. So what was the only compliant existing-stock pork that could be sold in California beginning January 1, 2022? The stock of in-state producers. This is yet another blatant example of Proposition 12's invidious discriminatory effect which has provided a windfall to in-state producers at the expense of out-of-state producers.

The district court rejected these arguments based on its interpretation of *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937 (9th Cir. 2013). Specifically, the district court determined that Proposition 12 "treats all companies the same," and cited

*Eleveurs* for the proposition that "a statute that treats all private companies exactly the same is not discriminatory even when only out-of-state businesses are burdened because there are no comparable in-state businesses." 1-ER-22–23. But the district court's application of that case was facially incorrect. There *are* comparable in-state businesses here, namely, California pork producers that—especially when looking at the practical effects that Proposition 2 and Proposition 12—received a longer ramp-up time to comply with the turnaround provisions than out-of-state producers and that received a windfall by having the only Proposition 12-compliant pork in the state after December 31, 2021. And not even mentioned in the district court's discussion is the fundamental discrimination inherent in California's passage and enforcement of Proposition 12: It targeted exclusively out-of-state producers once its own producers were already compliant due to Proposition 2.

This disparate treatment was exactly what the dormant Commerce Clause was designed to prevent. *See Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979) ("when considering the purpose of a challenged statute, th[e] Court is not bound by the name, description or characterization given it by the legislature or the courts of the State but will determine for itself

the practical impact of the law.") (cleaned up). This Court should find that IPPA has shown a likelihood of success on the merits for its dormant Commerce Claim on this basis alone and reverse the district court's determination to the contrary.

### b. *Proposition 12 fails the* Pike *test.*

Even if Proposition 12 is found to regulate even-handedly—which it does not—IPPA has still shown a likelihood of success on the merits for its dormant Commerce Clause claim under *Pike* and its progeny. "Where [a state] statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142; *see also S.D. Myers, Inc.*, 253 F.3d at 467. As discussed, a six-to-three majority of the Supreme Court confirmed that *Pike* remains good law and provides a valid framework to determine whether state laws are invalid under the dormant Commerce Clause. *NPPC*, 143 S. Ct. at 1170 (Kavanaugh, J., concurring in part and dissenting in part) (confirming that a six-Justice majority "affirmatively retain[ed] the longstanding

*Pike* balancing test for analyzing dormant Commerce Clause challenges to state economic regulations.").

Here, Proposition 12 *does* have a substantial impact on interstate commerce; although styled as a state law, it "in effect regulates pig farming and pork production throughout the *United States*." *Id.* at 1173 (Kavanaugh, J., concurring in part and dissenting in part). Proposition 12 violates *Pike*, and IPPA has at least a "fair chance" of succeeding on this claim to support a reversal of the district court's determination.

**Local Benefit.** In terms of local benefit, Proposition 12 is woefully lacking. The ballot initiative record was devoid of *actual proof* that Proposition 12 would accomplish its purported goals at protecting farm animals from cruel confinement practices, avoid foodborne illnesses, and negate negative fiscal impacts to California. In fact, California's own Economic Impact Assessment for Proposition 12 conceded that Proposition 12 does not "directly impact human health and welfare of California residents, worker safer, or the State's environment . . . ." *See* CDFA, ANIMAL CONFINEMENT INITIAL STATEMENT OF REASONS (May 28,

2021) at 141, 146[6]; *see also* CDFA, ANIMAL CONFINEMENT FINAL STATEMENT OF REASONS (Aug. 30, 2022) at 99 ("[T]here is not currently a consensus in peer-reviewed published scientific literature that would allow the Department to independently confirm, according to its usually scientific practices, that the specific minimum confinement standards . . . reduce the risk of human food-borne illness, promote worker safety, or other human or safety concerns"[7]). In contrast, the scientifically supported, expert testimony submitted by IPPA illustrates that the widely accepted and longstanding industry best practices of individual gestation confinement are better for the health and safety of both breeding pigs and their offspring. *See, e.g.*, 4-ER-481–87. Group confinement poses significant risks to the health and safety of pregnant pigs, including dominance and fighting by other breeding pigs, creating a high risk of loss of offspring. 4-ER-481–87. And California has no record evidence to tie current confinement practices to foodborne illnesses or any other health or food safety concern. *See* 3-ER-324. In fact, Dr. Johnson explained that group sow housing can actually *increase* the risk

---

[6]Available at https://www.cdfa.ca.gov/ahfss/pdfs/regulations/AnimalConfinementISOR_05252021.pdf.

[7] Available at www.cdfa.ca.gov/AHFSS/pdfs/FSOR_Final_8.30.22.pdf.

for disease and food safety concerns. 4-ER-481–87.[8] Moreover, any local benefit that *could* be derived is either marginal or largely illusory because other state and federal laws already protect against adulterated food products, particularly a staple such as pork meat. *See, e.g.*, Federal Meat Inspection Act, 21 U.S.C. § 601 (enacting an extensive statutory framework to ensure "that meat and meat food products distributed to [consumers] are wholesome, not adulterated, and properly marked, labeled, and packaged.").

In reality, the only practical "benefit" Proposition 12 provides is an economic advantage to California in-state producers at the expense of out-of-state producers. But, as discussed, this is not a valid state interest sufficient to justify discrimination. "Courts have repeatedly recognized that protecting a discrete interest group from economic competition is not a legitimate governmental purpose." *Craigmiles v. Giles*, 312 F.3d 220, 224 (6th Cir. 2002); *City of Phila. v. New Jersey*, 437 U.S. 617, 624 (1978)

---

[8] Notably, if Proposition 12 was truly concerned with preventing foodborne illness, it would not provide exemptions for a large swathe of pork products, including any and all "combination food products" such as "hotdogs, or similar processed or prepared food products," that will expose the California consumer to the *same* non-compliant pork meat. Cal. Health & Safety Code § 25991.

("Thus, where simple economic protectionism is effected by state legislation, a virtually per se rule of invalidity has been erected. The clearest example of such legislation is a law that overtly blocks the flow of interstate commerce at a State's borders."). In fact, "overtly block[ing] the flow of interstate commerce" at the border is exactly what Proposition 12 stands to accomplish. Under Proposition 12's regulations, an enforcement officer can block the sale of meat into California and hold the product at the border if the enforcement officer believes the meat violates Proposition 12. Cal. Code Regs. tit. 3, §§ 1322.6–.7 (granting California officials "access to inspect in California any vehicle . . . that is transporting whole pork meat into or within the state" and stating that officials may "deny entry to or order diversion from the state" or "seize and hold any containers, sub-containers, lots or loads of whole pork meat in California which they have reasonable suspicion to believe is in violation" of Proposition 12). Also, a violation of Proposition 12 is deemed to be a per se violation of California's Business and Professions Code, and thus the California Attorney General, any district attorney, county counsel, city attorney, city prosecutor, and even any person who meets

the standing requirements can file a lawsuit to enforce Proposition 12. This includes injunctive relief.  Cal. Bus. & Prof. Code §§ 17200, 17203.

Proposition 12 does not reflect a legitimate public interest. In fact, the record evidence *disproves* California's own asserted interests. The State's absence of evidence to justify its actions is particularly telling in light of the incredible burdens and consequences resulting from its regulation of out-of-state producers.

**Substantial Impact and Extraterritorial Effects under *Pike*.** Even if Proposition 12 served a legitimate state interest—which it does not—the impacts on interstate commerce are clearly excessive and outweigh any interest. In answering the question of whether in-state commerce is substantially impacted, courts will also examine whether Proposition 12 has any "impermissible extraterritorial effect." *NPPC v. Ross*, 6 F.4th 1021, 1026 (9th Cir. 2021), *aff'd*, 143 S. Ct. 1142 (2023); *NPPC*, 143 S. Ct. at 1170 (Roberts, C.J., concurring in part and dissenting in part) ("sweeping extraterritorial effects" are "pertinent in applying *Pike*."). While the Supreme Court rejected the argument that extraterritorial regulation is a per se violation of the dormant Commerce Clause, *NPPC v. Ross* in no way lessened the importance of this

consideration when conducting the *Pike* analysis. *NPPC*, 143 S. Ct. at 1155–56 ("In rejecting petitioners' 'almost per se' theory we do not mean to trivialize the role territory and sovereign boundaries play in our federal system."). If anything, *NPPC v. Ross* confirmed that *Pike* and its progeny considering extraterritorial effects of state law are still valid, as is the principle that "every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his export, and no foreign state will by customs duties or regulations exclude them." *H. P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 539 (1949); *see also Edgar v. MITE Corp.*, 457 U.S. 624, 643 (1982) (concluding that the "nationwide reach" of Illinois's law constituted an "obvious burden . . . on interstate commerce."); *NPPC*, 143 S. Ct. at 1170 (Kavanaugh, J., concurring in part and dissenting in part) (emphasizing that a six-Justice majority "affirmatively retain[ed] the longstanding *Pike* balancing test for analyzing dormant Commerce Clause challenges to state economic regulations."). At a minimum, these cases indicate that Proposition 12 may not expressly regulate farmers operating out of state in the manner in which IPPA has pleaded.

And for good reason. IPPA has described, at length, the devastating impact that Proposition 12 has on out-of-state pork producers. For example, IPPA Chief Executive Officer, Pat McGonegle, testified how Iowa's hog inventory of approximately 24.8 *million* hogs will be substantially impacted by Proposition 12. 2-ER-106–110. Specifically, McGonegle testified how Proposition 12 will impact Iowa farmers and the Iowa economy as a whole, considering the Iowa pork industry contributed to $6.8 billion dollars in Iowan household income annually concerning hog production, slaughter, processing and other activities including employee wages, salaries and benefits. 2-ER-107–110. And Dr. Glynn Tonsor, holding a Ph.D. in Agricultural Economics, testified about the gravity of this negative economic impact as well. 3-ER-202–211. These consequences – which Chief Justice Roberts was particularly concerned about in weighing the burden under *Pike's* progeny in *NPPC v. Ross*—not only included the fact that many IPPA members could not afford the costly alterations to their existing infrastructure, but that substantial new training and labor needs are required to implement Proposition 12 or risk culling breeding pigs early to ensure that the immediate offspring that exists is compliant and can be sold into California. *See* 2-ER-106–

110; *see also NPPC*, 143 S. Ct. at 1172 (Roberts, C.J., concurring in part and dissenting in part).

Accounting for the extraterritoriality impact ensures there is a limit to a state's ability to export its own laws to another and prevents "a new era where States shutter their markets to goods produced in a way that offends their moral or policy preferences—and in doing so, effectively force other States to regulate in accordance with those idiosyncratic state demands." *NPPC*, 143 S. Ct. at 1174 (Kavanaugh, J., concurring in part and dissenting in part). This significant consequence only invites a substantial risk of trade war between states that carries unimaginable risks for free trade between states.

The impact that Proposition 12 will have on other states is unquestionable. Unlike the *NPPC v. Ross* opinion, which arose only from the context of a motion to dismiss, this Court has a full preliminary injunction record replete with evidence that Proposition 12 constitutes a federal regulation on pork production. Not only that, the uncontroverted evidence shows that the effects will be devastating. The annual loss for consumers outside of California would exceed $303 million following higher pork prices due to Proposition 12's implementation. 3-ER-208.

Proposition 12 will result in a shortage of pork to California consumers with cascading effects across the county, with producers bearing the brunt of both increased costs to convert to Proposition 12's requirements, as well as from operating in markets where there may be too much pork supply because the meat cannot be sold in California. 3-ER-202, 3-ER-210.

And any contention that pork producers can simply ignore selling in California or otherwise divert their pigs from going to California is absurd. Producers cannot realistically forego the California market, as the California market makes up 13-15% of the nation's pork consumption market. If forced to exit the California market, many farmers' operations will become cost prohibitive based on loss in revenue from California consumers. 3-ER-206–207.

As stated aptly by Justice Kavanaugh, through Proposition 12, California

> has attempted, in essence, to unilaterally impose its moral and policy preferences for pig farming and pork production on the rest of the Nation. It has sought to deny market access to out-of-state pork producers unless their farming and production practices in those other States comply with California's dictates. The State has aggressively propounded a "California knows best" economic philosophy—where California in effect seeks to regulate pig farming and pork

> production in all of the United States. California's approach undermines federalism and the authority of individual States by forcing individuals and businesses in one State to conduct their farming, manufacturing, and production practices in a manner required by the laws of a different State.

*NPPC*, 143 S. Ct. at 1174 (Kavanaugh, J., concurring in part and dissenting in part). Because Proposition 12 cannot be justified by any legitimate purpose, and the burden it imposes on interstate commerce clearly outweighs any purported benefit, IPPA is likely to succeed on the merits of its dormant Commerce Clause claim under *Pike*.

*    *    *

No matter whether invalid as direct discrimination or as violative of the *Pike* test, Proposition 12 runs afoul of the dormant Commerce Clause and must be enjoined. It is critically important that this Court put a stop to this type of pernicious extraterritorial and discriminatory regulation. What is pork today could easily be apples, salmon, potatoes, lumber, electronics, wheat, corn, or coffee tomorrow. States around this Nation have built vibrant economies around the provision of unique goods. The citizens of those states, and of the country as a whole, depend on the dynamism of our interstate markets. No one state has the right to disrupt it unilaterally and unfairly; our Constitution prevents it.

And the hypotheticals don't have to go too far afield before becoming truly alarming. Recall that California is attempting to justify its enforcement of Proposition 12 based on its moral judgment around pig production. So could states condition the sale of certain products on the minimum wage that out-of-state companies' pay their workers; or their parental or sick leave policies; or the immigration status of their employees; or the type of health insurance they offer? Imagine a state having the right to retaliate, lashing back at California to prohibit the sale of California avocadoes or wine based upon certain labor or production practices. Can the social or moral issue *du jour* just become the subject of extraterritorial regulation? This is a slippery slope that this country simply cannot afford.

Our constitutional design, and the Tenth Amendment in particular, provide great leeway to states to regulate within their borders. But when they abuse that power and impose substantial burdens on the citizens of their sister states, the dormant Commerce Clause responds to preserve free interstate markets. California crossed the line with Proposition 12, and the district court erred in concluding otherwise.

### 2. IPPA has a fair chance to succeed on its Due Process Clause Claim because Proposition 12 is unconstitutionally vague.

As a penal statute,[9] Proposition 12 is void if it fails to "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *Kashem v. Barr*, 941 F.3d 358, 369 (9th Cir. 2019); *United States v. Shetler*, 665 F.3d 1150, 1164 (9th Cir. 2011).[10] Here, the criminalized conduct—"engag[ing] in the sale [of non-compliant pork meat] within the state"—is unconstitutionally vague in several respects. Cal. Health & Safety Code § 25990(b)(2).

---

[9] Proposition 12 is a penal statute because it carries significant criminal penalties. Cal Health & Safety Code § 25993(b) (A violation of Proposition 12 is punishable as a misdemeanor and by fines up to $1,000 or imprisonment for a period of up to 180 days).

[10] At this point in time, whether IPPA's challenge to Proposition 12 is styled as an as-applied challenge or as a facial challenge is not important, for such a distinction "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010). And for purposes of this preliminary injunction, the remedy is the same under either theory: a stay of enforcement of Proposition 12 pending a full ruling on the merits of this case.

For one, Proposition 12 does not define what "engaged in" means. And as the plain meaning of "engage" is incredibly broad, meaning "to employ or involve oneself," to "take part in," or to embark on," *Engage*, Black's Law Dictionary (11th ed. 2019), the reach of Proposition 12 is unclear at best and unlimited at worst, conceivably applying to anyone up and down the entire pork supply chain, anywhere in the world. For example, imagine an Iowa pig farmer provides noncompliant pigs to a processor in Oregon, and the Iowa farmer knows the processor sells to dozens of grocery stores all over the Nation. Imagine further that one of those grocery stores is in California. But for the Iowa farmer's participation in the supply chain, the sale would not have occurred to the California consumer—has the Iowa farmer engaged in this illegal sale? What if the Iowa farmer only supplied feed to a neighboring farmer who sold noncompliant pigs, processed within Iowa, and shipped directly to a California consumer? Proposition 12 provides no answer, just ambiguity.[11]

---

[11] In fact, there are plain examples of this ambiguity on display in this very record. In opposing the preliminary injunction, California argued below that IPPA has little cause for concern since there is no possibility that an out-of-state producer could be construed as having "engaged in the sale within the state" as "engaged in the sale" does not apply if a

It is true that Proposition 12 defines a "sale" as a "commercial sale by a business" that "shall be deemed to occur at the location where the buyer takes physical possession of a [covered item]." *Id.* § 25991(o). Citing to this definition, the district court found that Proposition 12 was "not unduly vague" since it "makes clear that an out-of-state producer is subject to Proposition 12 only if it 'engage[s] in a sale' to a buyer who 'takes physical possession' in California of an item covered by Proposition 12." 1-ER-13–16.

But that discussion misses the mark entirely. Specifying that the sale is the transaction occurring at the location where the buyer takes physical possession of non-compliant pork does not limit the scope of *who "engaged" in that sale*.[12] As explained above, under the plain meaning of the word "engaged," even if the sale being analyzed is the one that occurred where the buyer took possession, the entire pork supply chain

_____

producer does not sell pork products in California. 4-ER-656. But the California Superior Court, in its CHCC Order, found precisely opposite: the court explained that Proposition 12 plainly "prohibits persons in the supply chain from knowingly engaging in sales in intrastate sales . . . whether originating within or outside California[.]" 2-ER-64.

[12] Nor have the regulations attempted to clarify this ambiguity. *See* Cal. Code Regs. tit. 3, § 1322.

still arguably *engaged* in that sale.[13] To hold otherwise would be equating "selling" a prohibited product with "engaging in the sale" of the prohibited product. Thus, purely as a textual matter, the district court misunderstood Proposition 12's vagueness issues.

This misunderstanding is only further compounded by Proposition 12's accompanying regulations. The regulations expressly contemplate enforcement against production facilities *upstream* from the end "sale," expressly conflicting with the district court's analysis that it was "clear" that any out-of-state producers would not be "engaging" in that sale. For example, the regulations require the following:

- That "any in-state or *out-of-state person engaged in a commercial sale into or within* the state as a pork distributor, shall hold a valid registration with the Department pursuant to this Article." Cal. Code Regs. tit. 3, § 1322.2(a) (emphasis added).

- "A registration is required for each facility location *from which whole pork meat is sold, distributed, or otherwise supplied to the location of an end-user.*" *Id.* § 1322.2(d) (emphasis added).

- "A pork distributor shall not engage in the commercial sale of whole pork meat within, *or into*, California unless such person has obtained and holds a valid registration from the Department

---

[13] And at the very least, it could be the basis for an aiding and abetting or conspiracy charge, as Proposition 12 imposes criminal liability to unsuspecting farmers out of the state under California's conspiracy statute. *See* Cal. Penal Code Ann. §§ 27(a)(1), 182, and 184; 4-ER-512–13.

pursuant to this section for each facility location." *Id.* § 1322.2(e) (emphasis added).

Also, recall that Proposition 12 defines "sale" as a "commercial sale"; the regulations provide a definition for a "commercial sale," meaning "to sell, exchange, barter, trade, transfer title or possession, or distribute, conditional or otherwise, *in California commerce." Id.* § 1322(f) (emphasis added). Whether a sale occurred "in California commerce" presents an entirely new vagueness problem, especially applied to an industry like pork production, where essentially all of California's pork is shipped in from out of state. 4-ER-506 (alleging that "California cannot feed itself without massive agricultural imports from other states"). And lastly, the regulations provide a definition for where the buyer "takes physical possession," meaning "when the whole pork meat is delivered to the buyer in California, *regardless of whether the title transfer takes place outside of the state* . . . ." *Id.* § 1322(bb) (emphasis added). Not only do these regulations eviscerate any limiting effect that Proposition 12's geographical definition of "sale" may have had; by using the term "engage" themselves—without proving an accompanying definition—they aggravate and amplify the inherent vagueness problems within Proposition 12. Further, as producers rarely ever sell direct to end

users, they do not have any control over where their pigs—and the pork processed from them—will ultimately end up. 2-ER-109. So, a producer—who has no say in where their meat goes—is left wondering whether it should obtain a certification and oblige with Proposition 12 to continue providing its meat to a processor, who already have begun demanding Iowa farmers comply with the Proposition 12 certification requirements, likely due to this uncertainty on who will or will not be prosecuted. 2-ER-109.[14]

In addition to the criminal action that Proposition 12 targets, the criminal intent portion—"*knowingly*" engaging in such a sale—is also vague and ambiguous. Because it is unclear what "engaging in a sale" means, it is likewise impossible to determine whether one *knows* he is engaging in such a sale. And as Proposition 12 provides no explanation or framework to guide this decision, a pork producer is left to ponder whether it has knowledge about such "engagement." *See Cal. Teachers*

---

[14] And lastly, even if Proposition 12 were somehow construed being geographically limited by the definition of sale, or any other of its provisions or regulations, the central problem—what it means to "engage" in a sale—still imposes criminal liability to unsuspecting farmers out of the state under California's conspiracy statute. *See* Cal. Penal Code Ann. §§ 27(a)(1), 182, and 184; 4-ER-512–13.

*Ass'n v. St. Bd. of Educ.*, 263 F.3d 888, 904 (9th Cir. 2001) ("A scienter requirement cannot eliminate vagueness . . . if it is satisfied by an intent to do something that is in itself ambiguous." (quotation omitted)). The effect, then, is complete paralysis of the industry and supply chain by the fear of potential criminal prosecution.

This knowledge element is also particularly troublesome considering the realities of the pork industry. As previously noted, producers generally do not sell direct to a consumer or wholesaler. 2-ER-109 (stating that many of IPPA's members have no voice on where their pork is sold to due to the nature of the pork processing industry). Pork producers are left guessing whether supplying non-compliant pork to a packer who they *know* may ultimately will sell into the large State of California is considered "knowingly engaging in the sale" of whole pork meat. And because California is the largest market for pork in the nation, and pork producers know that 13–15% of the Nation's pork supply is consumed in California, producers are left guessing whether they *always* know they are engaging in the sale of prohibited pork in California. 4-ER-525.

As set forth above, Proposition 12 provides no notice of what is actually criminalized, because it fails to define what constitutes "engaging in" the sale of noncompliant pork or how one may "know" about that engagement. Thus, IPPA has shown a likelihood of success on the merits of its due process challenges.

## B.  IPPA members will incur immediate and irreparable harm absent a preliminary injunction.

The district court did not analyze any of the remaining preliminary injunction factors, resting its decision solely on the likelihood of success element. As discussed, the district court erred, and that conclusion should be reversed.  The remaining factors all weigh in IPPA's favor.

The first of the three—irreparable harm—occurs when a party has no adequate remedy at law. This occurs, for example, when its injuries cannot be fully compensated through an award of damages. *See Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). That is easily met here. Harm caused by a governmental entity due to constitutional violations is per se irreparable. *See e.g., Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1059 (9th Cir. 2009) (quoting *Nelson v. NASA*, 530 F.3d 865, 882 (9th Cir. 2008) ("Unlike monetary injuries, constitutional violations cannot be adequately

remedied through damages and therefore generally constitute irreparable harm")); *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997). Further, as set forth above, producers face immediate and irreparable harm in facing criminal penalties (including jail time) along with civil liability. *See, e.g., Airbnb, Inc. v. City and County of S.F.*, 217 F. Supp. 3d 1066 (N.D. Cal. 2016) ("Plaintiffs face a likelihood of irreparable harm by being exposed to criminal penalties."); *Pure Wafer, Inc. v. City of Prescott*, 14 F. Supp. 3d 1279, 1302 (D. Ariz. 2014).

Additionally, the threat of unrecoverable economic loss qualifies as irreparable harm. *See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994) (holding that permanent loss of customers satisfies the irreparable injury prong). Here, Proposition 12 will take an incredibly serious economic toll on pork producers. Production costs would increase by at least 21% for farrowing operations who convert production systems to comply with Proposition 12. 3-ER-201. Compliance with Proposition 12 will increase costs statewide for solely farrow-to-wean operations by at least $176.46 million each year. 3-ER-203. Further, operators must make major, costly facility overhauls to come into compliance with Proposition 12. 3-ER-203. The

costs of such renovations may be cost prohibitive, especially for smaller producers; and as evidence indicates that less than 4% of the United States currently has the housing capacity to be able to meet Proposition 12 requirements, producers may need to decrease their overall herd size by culling breeding pigs early, with devastating financial costs.[15] *See, e.g.*, 3-ER-205–207.

Additionally, IPPA members will suffer irreparable harm absent a preliminary injunction because they cannot recover monetary damages directly from California due to its sovereign immunity. *California Hosp. Ass'n v. Maxwell-Jolly*, No. CIV S-10-3465, 2011 WL 285866, at *2 (E.D. Cal. Jan. 28, 2011) (finding plaintiff could show irreparable harm by establishing its members would lose considerable revenue which were unrecoverable due to sovereign immunity); *see also California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) ("Economic harm is not normally

---

[15]  It may be true that in the long run, any ability to pass costs on to consumers may alleviate some financial stress caused by Proposition 12. *See NPPC*, 143 S. Ct. at 1162. But this is "cold comfort" for pork producers—particularly smaller producers—that will be harmed in the *short term* by Proposition 12 as they will be unable to keep any profitable margin. *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 356 (2002) (Thomas, J., dissenting) ("After all, '*[i]n the long run we are all dead.*" (quoting J. Keynes, Monetary Reform 88 (1924)).

considered irreparable. However, such harm is irreparable here because the states will not be able to recover monetary damages") (citation omitted).

Proposition 12 will have a direct, immediate, irreparable effect on pork producers, the entire pork supply chain, and ancillary industries. Absent a preliminary injunction, producers will suffer immediate and extended irreparable economic harm. This factor weighs in favor of IPPA.

## C.   The balance of equities is strongly in favor of IPPA and a preliminary injunction is in the public's best interest.

To determine the balance of the equities, the court must weigh the possible harm caused by the grant or denial of injunctive relief. *See Univ. of Hawai'i Prof. Assembly v. Cayetano*, 183 F.3d 1096, 1108 (9th Cir. 1999). Here, because the only "harm" California will face is its inability to enforce an unconstitutional law that would wreak economic harm across the national pork production system, the balance of harms, as well as the public interest, clearly weigh in favor of IPPA.

Already described above, Proposition 12 will have an immediate detrimental effect on the public. The importance of having a plentiful and affordable food supply is obvious, and the evidence submitted below

indicates that Proposition 12 will force an immediate pork shortage within California. 2-ER-207–08. This will have a domino effect, creating a pork surplus in the remainder of the country, which will drive down prices elsewhere. 2-ER-207–08. Thereafter, the price of pork is estimated to *increase* by at least an average of 4%, creating average annual consumer losses across 47 markets examined nationwide of over $303 million per year. 2-ER-206–08. And this is only the harm to the consumer; as described above, pork producers will be catastrophically impacted, as will be the jobs and income associated with the pork industry in states like Iowa. 2-ER-206–08; 4-ER-517–524.

Furthermore, maintaining the status quo, particularly when doing so will not prejudice the non-moving party, is a central justification for granting preliminary injunctive relief. *See Ramos v. Wolf*, 975 F.3d 872. 887 (9th Cir. 2020). Given that Proposition 12 *will actually harm* California consumers by creating an immediate pork shortage, no prejudice to California exists in light of the overwhelming harms ahead for IPPA and nationwide pork consumers. With an injunction, the near-term result will simply be that tried-and-true industry standards and practices will remain unchanged for the time being, at least until the

courts can fully evaluate the constitutionality of California's experiment with America's pork production system.

In sum, IPPA has shown a likelihood of success on the merits for its dormant Commerce Clause claims and its due process claims. Further, given the irreparable harms at stake and the public's interest, IPPA respectfully requests this Court reverse the district court and direct it to enter a preliminary injunction barring enforcement of Proposition 12 pending the outcome of a merits-based decision in this matter.

## II.  IPPA Sufficiently Pleaded its Claims to Overcome a Motion to Dismiss.

In addition to improperly denying IPPA's request for a preliminary injunction, the district court went a step further and dismissed IPPA's lawsuit in its entirety.  This too was error.  At the *very least*, IPPA has stated claims under the liberal pleading standard and should be permitted to continue to pursue those claims in the district court.

### A.  IPPA adequately pleaded its Commerce Clause claims and Due Process claims.

As set forth above, IPPA has established a likelihood of success on the merits on both its dormant Commerce Clause claims and its due process claims. For those same reasons, the district court erred when it

dismissed these claims outright—the district court's decision was based on the same fundamental legal errors. Moreover, the district court erred in dismissing these claims for several additional, important reasons.

First, the district court did not fairly credit the allegations in the FAC. Instead of accepting as true all the material allegations and making all reasonable inferences in support of IPPA, the district court made inferences contrary to IPPA's allegations. This is illustrated most acutely in the district court's consideration of an amicus brief submitted in support of California. 1-ER-38–39. The amicus brief—unsurprisingly authored by in-state California pork producers, who again, only stand to benefit under Proposition 12's regime to the detriment of out-of-state pork producers—contends that "compliance [with Proposition 12] is straightforward and economically feasible" and that "industry leaders have already implemented and satisfied compliance requirements." 1-ER-38–39. Instead of crediting the allegations in the FAC, the district court *cited* and directly *quoted* this brief, thereby adopting the contentions there despite the fact they openly conflict with the allegations in the FAC. 1-ER-38–39. For example, the district court failed to recognize the stark difference in volume of breeding pigs within

California in comparison to Iowa. As set forth in the FAC, although California consumes about 13–15% of all pork consumed in the entire United States, there are as few as 8,000 breeding pigs in California. 4-ER-505–06. In contrast, in 2020, Iowa had 960,000 breeding pigs and more than *22 million hogs and pigs in total*. 4-ER-505–06, 4-ER-518. The district court shouldn't have been considering factual allegations outside of the FAC itself *at all*, much less in a way that directly conflicts with the allegations themselves.

Another error appears where the district court dismissed IPPA's due process claims because "plaintiff has not shown how [Proposition 12] has been applied to its members," and that IPPA had failed to allege that its members "are going to represent to their distributors that non-compliant [sic] meat is compliant." 1-ER-40. That has the law backwards. IPPA is not required to actually *face* prosecution to bring an as-applied challenge. *MedImmune, Inc. v. Genentech, Inc.* 549 U.S. 118, 128–29 (2007); *see also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) ("When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of

prosecution thereunder, [it] should not be required to await and undergo a criminal prosecution as the sole means of seeking relief" (quotation omitted)). Further, IPPA alleged that producers across Iowa are already being told by the packers to which they sell product that Proposition 12 compliance will be required. 2-ER-109. Because the threat of enforcement is real and valid, the district court erred in dismissing this claim.

The district court also erred when it dismissed IPPA's dormant Commerce Clause claim for similar reasons. It concluded, without analysis, that Proposition 12 "makes no distinction between in-state and out-of-state pork producers" and that IPPA had "failed to plausibly allege that the purpose of Proposition 12 . . . was motivated by economic protectionism." 1-ER-47–48. But the FAC precisely alleges this, pointing out the discriminatory impact and economic protectionism exhibited by Proposition 12. 4-ER-511–536.

In particular, the district court inappropriately used a standard more akin to summary judgment when it determined that IPPA could not plausibly state a claim that Proposition 12 had a discriminatory impact because it had three years to comply with the turnaround requirements. 1-ER-49. For one, this undersells the impact the square footage

requirements had, for which out-of-state producers received mere weeks to become compliant. But more importantly, it was incorrect as a matter of law. The discriminatory impact was well-alleged by IPPA; and to the extent the district court faulted IPPA for not having evidence in support for its allegations, or if it found any factual dispute as to the lengths of that impact, such matters are inappropriate for consideration at the motion to dismiss stage given the allegations to the contrary.

Consequently, IPPA requests that this Court reverse and remand the district court's dismissal of its dormant Commerce Clause claim and its due process claims so that they may be heard on a full record.

## B. IPPA sufficiently pleaded its Privileges and Immunities claim.

The district court also erred in dismissing IPPA's claim under the Privileges and Immunities Clause. Under the Privileges and Immunities Clause of the Fourth Amendment, "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV § 2 cl. 1. As relevant here, the Privileges and Immunities Clause "prevent[s] State[s] from imposing unreasonable burdens on citizens of other States in their pursuit of common callings

within the State." *Baldwin v. Fish and Game Comm'n of Montana*, 436 U.S. 371, 383 (1978).

Below, the district court dismissed this claim on the basis that Proposition 12 applies equally to all pork meat sold within California, regardless of where it was produced, and therefore IPPA could not allege that California is "discriminating against citizens of other states in favor of its own." 1-ER-42. This simply is not true; IPPA alleged and argued that Proposition 12 violates the Privileges and Immunities Clause because it impairs the right and ability of out-of-state producers to do business within California and was designed to take away an economic advantage that out-of-state producers had by not being required to comply with the turnaround provisions to sell pork in California. 4-ER-534–35. Specifically, the FAC laid out the discriminatory impact of Proposition 12 in detail, explaining the nearly decade-long head start that in-state producers received to overhaul their facilities and operations to comply with the turnaround provisions; and by extension, they were provided an easy stepping-stone to compliance with the square footage requirements. 4-ER-534–35. This allowed them to spread out the cost of compliance more easily, whereas, due to the immediate effective

date of Proposition 12, out-of-state producers had virtually no time to come into compliance and were not previously on notice of the turnaround provisions. 4-ER-534–35. The district court's failure to credit these allegations was tantamount to rendering a decision on the merits of this claim rather than on the allegations as required by Rule 12(b)(6). These allegations are exactly the type of harm the Clause is intended to preclude. *Cf. NPPC*, 143 S. Ct. at 1153 (reasoning that the antidiscrimination principle commonly associated with the dormant Commerce Clause is enshrined in the Privileges and Immunities Clause); *see also id.* at 1175 (Kavanaugh, J., concurring in part and dissenting in part) ("Under this Court's precedents, one State's efforts to effectively regulate farming, manufacturing, or production in other States could raise significant questions under that Clause.").

Because the FAC sufficiently alleges a claim under the Privileges and Immunities Clause of the Fourth Amendment, IPPA respectfully requests this Court reverse dismissal of this claim.

## C. IPPA sufficiently pleaded its preemption claim.

Lastly, the district court also erred in dismissing IPPA's preemption arguments because Proposition 12 conflicts with federal law,

namely, the Packers and Stockyards Act, 7 U.S.C. § 181 (the "PSA"). "[S]tate laws are invalid if they 'regulate[] the United States directly or discriminate against the Federal Government or those with whom it deals.'" *United States v. California*, 921 F.3d 865, 878 (9th Cir. 2019) (quotation omitted). Known as conflict preemption, the doctrine arises when "[1] compliance with both federal and state regulations is a physical impossibility, or [2] when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *McClellan v. I-Flow Corp.*, 776 F.3d 1035, 1039 (9th Cir. 2015) (quotation omitted).

Here, Proposition 12 violates the principles of preemption because it is impossible to comply with both Proposition 12 and the PSA, or at the very least, because Proposition 12 creates a significant obstacle to the PSA. The PSA prohibits any packer or swine contractor from providing any preference to a particular locality and from subjecting any particular locality to a "disadvantage" in the sale of meat. *See* 7 U.S.C. § 192(b). But Proposition 12 directly requires packers or wholesalers to favor in-state localities and to disadvantage out-of-state localities who have not had as much time to come into compliance with the turnaround provisions or

could not meet the square footage requirements deadline. 4-ER-534–37. Therefore, it is impossible for a wholesaler to comply with both Proposition 12 and the PSA. 4-ER-534–37. And at the very least, even if packers could comply with both state and federal law, Proposition 12 creates obstacles to accomplishing the PSA's objectives because it requires wholesalers to favor in-state producers as alleged in the FAC. 4-ER-534–37.

IPPA alleged these elements in the FAC. Once again, the district court impermissibly let factual considerations bleed into its consideration, and thus this Court should reverse the dismissal of IPPA's preemption claim.

## CONCLUSION

This Court should reverse the district court's dismissal of IPPA's case. Further, this Court should reverse the district court's denial of IPPA's motion for preliminary injunction and direct that the district court enjoin the enforcement of Proposition 12 during the pendency of this case.

August 4, 2023

Respectfully submitted,

*/s/ Michael T. Raupp*
RYANN A. GLENN
HUSCH BLACKWELL LLP
13330 California Street, Suite 200
Omaha, NE 68154
Telephone (402) 964-5000
Facsimile (402)964-5050
ryann.glenn@huschblackwell.com

and

MICHAEL T. RAUPP
HUSCH BLACKWELL LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
Telephone (816) 983-8000
Facsimile (816) 983-8080
michael.raupp@huschblackwell.com

*Counsel for Plaintiff-Appellant*

## STATEMENT OF RELATED CASES

Appellant Iowa Pork Producers Association is not aware of any related cases pending in this Court.

# CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Cir. R. 32-1 because this brief contains 13,255 words.

2.     This brief complies with the typeface and type style requirements of FED. R. APP. P. 32(a)(5) and (6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Century Schoolbook font.


*/s/ Michael T. Raupp*

## CERTIFICATE OF SERVICE

I certify that on August 4, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that all participants are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Michael T. Raupp*

# STATUTORY ADDENDUM

# TABLE OF CONTENTS

Page

Cal. Bus. & Prof. Code § 17200 ............................................................ A-1

Cal. Bus. & Prof. Code § 17203 ............................................................ A-2

Cal. Bus. & Prof. Code § 17206 ............................................................ A-3

Cal. Health & Safety Code § 25990 ..................................................... A-5

Cal. Health & Safety Code § 25991 ..................................................... A-7

Cal. Health & Safety Code § 25993 ..................................................... A-11

Cal. Health & Safety Code § 25994 ..................................................... A-12

Cal. Penal Code Ann. § 27(a)(1) ......................................................... A-13

Cal. Penal Code Ann. § 182 ................................................................. A-15

Cal. Penal Code Ann. § 184 ................................................................. A-17

Cal. Code Regs. tit. 3, § 1322.2 ........................................................... A-18

Cal. Code Regs. tit. 3, §§ 1322.6–.7 .................................................... A-20

West's Annotated California Codes
    Business and Professions Code (Refs & Annos)
        Division 7. General Business Regulations (Refs & Annos)
            Part 2. Preservation and Regulation of Competition (Refs & Annos)
                Chapter 5. Enforcement (Refs & Annos)

West's Ann.Cal.Bus. & Prof.Code § 17200

§ 17200. Unfair competition; prohibited activities

Currentness

As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code.

**Credits**
(Added by Stats.1977, c. 299, p. 1202, § 1. Amended by Stats.1992, c. 430 (S.B.1586), § 2.)

West's Ann. Cal. Bus. & Prof. Code § 17200, CA BUS & PROF § 17200
Current with Ch. 1 of 2023-24 1st Ex.Sess, and urgency legislation through Ch. 101 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**A-1**

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works.  1

---

West's Annotated California Codes
  Business and Professions Code (Refs & Annos)
    Division 7. General Business Regulations (Refs & Annos)
      Part 2. Preservation and Regulation of Competition (Refs & Annos)
        Chapter 5. Enforcement (Refs & Annos)

West's Ann.Cal.Bus. & Prof.Code § 17203

§ 17203. Injunctive Relief--Court Orders [1]

Effective: November 3, 2004

Currentness

Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition. Any person may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements of Section 17204 and complies with Section 382 of the Code of Civil Procedure, but these limitations do not apply to claims brought under this chapter by the Attorney General, or any district attorney, county counsel, city attorney, or city prosecutor in this state.

**Credits**

(Added by Stats.1977, c. 299, p. 1202, § 1. Amended by Stats.1992, c. 430 (S.B.1586), § 3; Initiative Measure (Prop. 64, § 2, approved Nov. 2, 2004, eff. Nov. 3, 2004).)

**Footnotes**

1    Section caption supplied by Prop. 64.

West's Ann. Cal. Bus. & Prof. Code § 17203, CA BUS & PROF § 17203
Current with Ch. 1 of 2023-24 1st Ex.Sess், and urgency legislation through Ch. 101 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

---

**End of Document**                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**A-2**

---

West's Annotated California Codes
  Business and Professions Code (Refs & Annos)
    Division 7. General Business Regulations (Refs & Annos)
      Part 2. Preservation and Regulation of Competition (Refs & Annos)
        Chapter 5. Enforcement (Refs & Annos)

West's Ann.Cal.Bus. & Prof.Code § 17206

§ 17206. Civil Penalty for Violation of Chapter [1]

Effective: January 1, 2022

Currentness

(a) Any person who engages, has engaged, or proposes to engage in unfair competition shall be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation, which shall be assessed and recovered in a civil action brought in the name of the people of the State of California by the Attorney General, by any district attorney, by any county counsel authorized by agreement with the district attorney in actions involving violation of a county ordinance, by any city attorney of a city having a population in excess of 750,000, or by a county counsel of any county within which a city has a population in excess of 750,000, by any city attorney of any city and county, or, with the consent of the district attorney, by a city prosecutor in any city having a full-time city prosecutor, in any court of competent jurisdiction.

(b) The court shall impose a civil penalty for each violation of this chapter. In assessing the amount of the civil penalty, the court shall consider any one or more of the relevant circumstances presented by any of the parties to the case, including, but not limited to, the following: the nature and seriousness of the misconduct, the number of violations, the persistence of the misconduct, the length of time over which the misconduct occurred, the willfulness of the defendant's misconduct, and the defendant's assets, liabilities, and net worth.

(c)(1) If the action is brought by the Attorney General, one-half of the penalty collected shall be paid to the treasurer of the county in which the judgment was entered, and one-half to the General Fund.

(2) If the action is brought by a district attorney or county counsel, the penalty collected shall be paid to the treasurer of the county in which the judgment was entered.

(3)(A) Except as provided in subparagraph (B) and subdivision (e), if the action is brought by a city attorney or city prosecutor, one-half of the penalty collected shall be paid to the treasurer of the city in which the judgment was entered, and one-half to the treasurer of the county in which the judgment was entered.

(B) If the action is brought by the City Attorney of San Diego, the penalty collected shall be paid to the treasurer of the City of San Diego.

(4) The aforementioned funds shall be for the exclusive use by the Attorney General, the district attorney, the county counsel, and the city attorney for the enforcement of consumer protection laws.

**A-3**

(d) The Unfair Competition Law Fund is hereby created as a special account within the General Fund in the State Treasury. The portion of penalties that is payable to the General Fund or to the Treasurer recovered by the Attorney General from an action or settlement of a claim made by the Attorney General pursuant to this chapter or Chapter 1 (commencing with Section 17500) of Part 3 shall be deposited into this fund. Moneys in this fund, upon appropriation by the Legislature, shall be used by the Attorney General to support investigations and prosecutions of California's consumer protection laws, including implementation of judgments obtained from such prosecutions or investigations and other activities which are in furtherance of this chapter or Chapter 1 (commencing with Section 17500) of Part 3. Notwithstanding Section 13340 of the Government Code, any civil penalties deposited in the fund pursuant to the National Mortgage Settlement, as provided in Section 12531 of the Government Code, are continuously appropriated to the Department of Justice for the purpose of offsetting General Fund costs incurred by the Department of Justice.

(e) If the action is brought at the request of a board within the Department of Consumer Affairs or a local consumer affairs agency, the court shall determine the reasonable expenses incurred by the board or local agency in the investigation and prosecution of the action.

Before any penalty collected is paid out pursuant to subdivision (c), the amount of any reasonable expenses incurred by the board shall be paid to the Treasurer for deposit in the special fund of the board described in Section 205. If the board has no such special fund, the moneys shall be paid to the Treasurer. The amount of any reasonable expenses incurred by a local consumer affairs agency shall be paid to the general fund of the municipality or county that funds the local agency.

(f) If the action is brought by a city attorney of a city and county, the entire amount of the penalty collected shall be paid to the treasurer of the city and county in which the judgment was entered for the exclusive use by the city attorney for the enforcement of consumer protection laws. However, if the action is brought by a city attorney of a city and county for the purposes of civil enforcement pursuant to Section 17980 of the Health and Safety Code or Article 3 (commencing with Section 11570) of Chapter 10 of Division 10 of the Health and Safety Code, either the penalty collected shall be paid entirely to the treasurer of the city and county in which the judgment was entered or, upon the request of the city attorney, the court may order that up to one-half of the penalty, under court supervision and approval, be paid for the purpose of restoring, maintaining, or enhancing the premises that were the subject of the action, and that the balance of the penalty be paid to the treasurer of the city and county.

**Credits**
(Added by Stats.1977, c. 299, p. 1202, § 1. Amended by Stats.1979, c. 897, p. 3101, § 2; Stats.1991, c. 1195 (S.B.709), § 2; Stats.1991, c. 1196 (A.B.1755), § 2; Stats.1992, c. 430 (S.B.1586), § 4; Stats.1997, c. 17 (S.B.947), § 11; Initiative Measure (Prop. 64, § 4, approved Nov. 2, 2004), eff. Nov. 3, 2004); Stats.2005, c. 74 (A.B.139), § 23, eff. July 19, 2005; Stats.2007, c. 17 (S.B.376), § 2; Stats.2012, c. 32 (S.B.1006), § 1, eff. June 27, 2012; Stats.2020, c. 75 (A.B.3020), § 1, eff. Jan. 1, 2021; Stats.2021, c. 140 (S.B.461), § 2, eff. Jan. 1, 2022.)

**Footnotes**

1    Section caption supplied by Stats.2021, c. 140 (S.B.461).

West's Ann. Cal. Bus. & Prof. Code § 17206, CA BUS & PROF § 17206
Current with Ch. 1 of 2023-24 1st Ex.Sess., and urgency legislation through Ch. 101 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

A-4

---

> West's Annotated California Codes
>> Health and Safety Code (Refs & Annos)
>>> Division 20. Miscellaneous Health and Safety Provisions (Refs & Annos)
>>> Chapter 13.8. Farm Animal Cruelty (Refs & Annos)

West's Ann.Cal.Health & Safety Code § 25990

§ 25990. Prohibitions [1]

Effective: December 19, 2018

Currentness

In addition to other applicable provisions of law:

(a) A farm owner or operator within the state shall not knowingly cause any covered animal to be confined in a cruel manner.

(b) A business owner or operator shall not knowingly engage in the sale within the state of any of the following:

(1) Whole veal meat that the business owner or operator knows or should know is the meat of a covered animal who was confined in a cruel manner.

(2) Whole pork meat that the business owner or operator knows or should know is the meat of a covered animal who was confined in a cruel manner, or is the meat of immediate offspring of a covered animal who was confined in a cruel manner.

(3) Shell egg that the business owner or operator knows or should know is the product of a covered animal who was confined in a cruel manner.

(4) Liquid eggs that the business owner or operator knows or should know are the product of a covered animal who was confined in a cruel manner.

**Credits**

(Added by Initiative Measure (Prop. 2, § 3, approved Nov. 4, 2008, operative Jan. 1, 2015). Amended by Initiative Measure (Prop. 12, § 3, approved Nov. 6, 2018, eff. Dec. 19, 2018).)

**Footnotes**

1   Section caption supplied by Prop. 12.

**A-5**

---

West's Ann. Cal. Health & Safety Code § 25990, CA HLTH & S § 25990

Current with Ch. 1 of 2023-24 1st Ex.Sess, and urgency legislation through Ch. 101 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

**End of Document**                                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

A-6

West's Annotated California Codes
   Health and Safety Code (Refs & Annos)
     Division 20. Miscellaneous Health and Safety Provisions (Refs & Annos)
       Chapter 13.8. Farm Animal Cruelty (Refs & Annos)

West's Ann.Cal.Health & Safety Code § 25991

§ 25991. Definitions [1]

Effective: December 19, 2018
Currentness

For the purposes of this chapter, the following terms have the following meanings:

(a) "Breeding pig" means any female pig of the porcine species kept for the purpose of commercial breeding who is six months or older or pregnant.

(b) "Business owner or operator" means any person who owns or controls the operations of a business.

(c) "Cage-free housing system" means an indoor or outdoor controlled environment for egg-laying hens within which hens are free to roam unrestricted; are provided enrichments that allow them to exhibit natural behaviors, including, at a minimum, scratch areas, perches, nest boxes, and dust bathing areas; and within which farm employees can provide care while standing within the hens' usable floorspace. Cage-free housing systems include, to the extent they comply with the requirements of this subdivision, the following:

(1) Multitiered aviaries, in which hens have access to multiple elevated platforms that provide hens with usable floorspace both on top of and underneath the platforms.

(2) Partially slatted systems, in which hens have access to elevated flat platforms under which manure drops through the flooring to a pit or litter removal belt below.

(3) Single-level all-litter floor systems bedded with litter, in which hens have limited or no access to elevated flat platforms.

(4) Any future systems that comply with the requirements of this subdivision.

(d) "Calf raised for veal" means any calf of the bovine species kept for the purpose of producing the food product described as veal.

(e) "Confined in a cruel manner" means any one of the following acts:

**A-7**

(1) Confining a covered animal in a manner that prevents the animal from lying down, standing up, fully extending the animal's limbs, or turning around freely.

(2) After December 31, 2019, confining a calf raised for veal with less than 43 square feet of usable floorspace per calf.

(3) After December 31, 2021, confining a breeding pig with less than 24 square feet of usable floorspace per pig.

(4) After December 31, 2019, confining an egg-laying hen with less than 144 square inches of usable floorspace per hen.

(5) After December 31, 2021, confining an egg-laying hen with less than the amount of usable floorspace per hen required by the 2017 edition of the United Egg Producers' Animal Husbandry Guidelines for U.S. Egg-Laying Flocks: Guidelines for Cage-Free Housing or in an enclosure other than a cage-free housing system.

(f) "Covered animal" means any calf raised for veal, breeding pig, or egg-laying hen who is kept on a farm.

(g) "Egg-laying hen" means any female domesticated chicken, turkey, duck, goose, or guineafowl kept for the purpose of egg production.

(h) "Enclosure" means a structure used to confine a covered animal or animals.

(i) "Farm" means the land, building, support facilities, and other equipment that are wholly or partially used for the commercial production of animals or animal products used for food or fiber; and does not include live animal markets, establishments at which mandatory inspection is provided under the Federal Meat Inspection Act (21 U.S.C. Sec. 601 et seq.), or official plants at which mandatory inspection is maintained under the federal Egg Products Inspection Act (21 U.S.C. Sec. 1031 et seq.).

(j) "Farm owner or operator" means any person who owns or controls the operations of a farm.

(k) "Fully extending the animal's limbs" means fully extending all limbs without touching the side of an enclosure, or another animal.

(*l*) "Liquid eggs" means eggs of an egg-laying hen broken from the shells, intended for human food, with the yolks and whites in their natural proportions, or with the yolks and whites separated, mixed, or mixed and strained. Liquid eggs do not include combination food products, including pancake mixes, cake mixes, cookies, pizzas, cookie dough, ice cream, or similar processed or prepared food products, that are comprised of more than liquid eggs, sugar, salt, water, seasoning, coloring, flavoring, preservatives, stabilizers, and similar food additives.

(m) "Person" means any individual, firm, partnership, joint venture, association, limited liability company, corporation, estate, trust, receiver, or syndicate.

**A-8**

(n) "Pork meat" means meat, as defined in Section 900 of Title 3 of the California Code of Regulations as of August 2017, of a pig of the porcine species, intended for use as human food.

(*o*) "Sale" means a commercial sale by a business that sells any item covered by this chapter, but does not include any sale undertaken at an establishment at which mandatory inspection is provided under the Federal Meat Inspection Act (21 U.S.C. Sec. 601 et seq.), or any sale undertaken at an official plant at which mandatory inspection is maintained under the federal Egg Products Inspection Act (21 U.S.C. Sec. 1031 et seq.). For purposes of this section, a sale shall be deemed to occur at the location where the buyer takes physical possession of an item covered by Section 25990.

(p) "Shell egg" means a whole egg of an egg-laying hen in its shell form, intended for use as human food.

(q) "Turning around freely" means turning in a complete circle without any impediment, including a tether, and without touching the side of an enclosure or another animal.

(r) "Uncooked" means requiring cooking prior to human consumption.

(s) "Usable floorspace" means the total square footage of floorspace provided to each covered animal, as calculated by dividing the total square footage of floorspace provided to the animals in an enclosure by the number of animals in that enclosure. In the case of egg-laying hens, usable floorspace shall include both groundspace and elevated level flat platforms upon which hens can roost, but shall not include perches or ramps.

(t) "Veal meat" means meat, as defined in Section 900 of Title 3 of the California Code of Regulations as of August 2017, of a calf raised for veal intended for use as human food.

(u) "Whole pork meat" means any uncooked cut of pork, including bacon, ham, chop, ribs, riblet, loin, shank, leg, roast, brisket, steak, sirloin, or cutlet, that is comprised entirely of pork meat, except for seasoning, curing agents, coloring, flavoring, preservatives, and similar meat additives. Whole pork meat does not include combination food products, including soups, sandwiches, pizzas, hotdogs, or similar processed or prepared food products, that are comprised of more than pork meat, seasoning, curing agents, coloring, flavoring, preservatives, and similar meat additives.

(v) "Whole veal meat" means any uncooked cut of veal, including chop, ribs, riblet, loin, shank, leg, roast, brisket, steak, sirloin, or cutlet, that is comprised entirely of veal meat, except for seasoning, curing agents, coloring, flavoring, preservatives, and similar meat additives. Whole veal meat does not include combination food products, including soups, sandwiches, pizzas, hotdogs, or similar processed or prepared food products, that are comprised of more than veal meat, seasoning, curing agents, coloring, flavoring, preservatives, and similar meat additives.

**Credits**

(Added by Initiative Measure (Prop. 2, § 3, approved Nov. 4, 2008, operative Jan. 1, 2015. Amended by Initiative Measure (Prop. 12, § 4, approved Nov. 6, 2018, eff. Dec. 19, 2018).)

**A-9**

**Footnotes**

1    Section caption supplied by Prop. 12.

West's Ann. Cal. Health & Safety Code § 25991, CA HLTH & S § 25991
Current with Ch. 1 of 2023-24 1st Ex.Sess, and urgency legislation through Ch. 101 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**A-10**

West's Annotated California Codes
  Health and Safety Code (Refs & Annos)
    Division 20. Miscellaneous Health and Safety Provisions (Refs & Annos)
      Chapter 13.8. Farm Animal Cruelty (Refs & Annos)

West's Ann.Cal.Health & Safety Code § 25993

§ 25993. ENFORCEMENT [1]

Effective: December 19, 2018

Currentness

(a) The Department of Food and Agriculture and the State Department of Public Health shall jointly promulgate rules and regulations for the implementation of this act by September 1, 2019.

(b) Any person who violates any of the provisions of this chapter is guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine not to exceed one thousand dollars ($1,000) or by imprisonment in the county jail for a period not to exceed 180 days or by both such fine and imprisonment. In addition, a violation of subdivision (b) of Section 25990 constitutes unfair competition, as defined in Section 17200 of the Business and Professions Code, and is punishable as prescribed in Chapter 5 (commencing with Section 17200) of Part 2 of Division 7 of the Business and Professions Code.

(c) The provisions of this chapter relating to cruel confinement of covered animals and sale of products shall supersede any conflicting regulations, including conflicting regulations in Chapter 6 (commencing with Section 40601) of Subdivision 6 of Division 2 of Title 22 of the California Code of Regulations.

**Credits**

(Added by Initiative Measure (Prop. 2, § 3, approved Nov. 4, 2008, operative Jan. 1, 2015). Amended by Initiative Measure (Prop. 12, § 6, approved Nov. 6, 2018, eff. Dec. 19, 2018).)

**Footnotes**

[1]      Section caption supplied by Prop. 12.

West's Ann. Cal. Health & Safety Code § 25993, CA HLTH & S § 25993
Current with Ch. 1 of 2023-24 1st Ex.Sess., and urgency legislation through Ch. 101 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**A-11**

West's Annotated California Codes
  Health and Safety Code (Refs & Annos)
    Division 20. Miscellaneous Health and Safety Provisions (Refs & Annos)
      Chapter 13.8. Farm Animal Cruelty (Refs & Annos)

West's Ann.Cal.Health & Safety Code § 25994

§ 25994. Construction of chapter [1]

Effective: January 1, 2015

Currentness

The provisions of this chapter are in addition to, and not in lieu of, any other laws protecting animal welfare, including the California Penal Code. This chapter shall not be construed to limit any state law or regulations protecting the welfare of animals, nor shall anything in this chapter prevent a local governing body from adopting and enforcing its own animal welfare laws and regulations.

**Credits**

(Added by Initiative Measure (Prop. 2, § 3, approved Nov. 4, 2008, operative Jan. 1, 2015).)

**Footnotes**

[1]     Section caption supplied by Prop. 2.

West's Ann. Cal. Health & Safety Code § 25994, CA HLTH & S § 25994
Current with Ch. 1 of 2023-24 1st Ex.Sess., and urgency legislation through Ch. 101 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

**End of Document**         © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**A-12**

West's Annotated California Codes
    Penal Code (Refs & Annos)
        Part 1. Of Crimes and Punishments (Refs & Annos)
            Title 1. Of Persons Liable to Punishment for Crime (Refs & Annos)

West's Ann.Cal.Penal Code § 27

§ 27. Persons liable to punishment

Currentness

(a) The following persons are liable to punishment under the laws of this state:

(1) All persons who commit, in whole or in part, any crime within this state.

(2) All who commit any offense without this state which, if committed within this state, would be larceny, carjacking, robbery, or embezzlement under the laws of this state, and bring the property stolen or embezzled, or any part of it, or are found with it, or any part of it, within this state.

(3) All who, being without this state, cause or aid, advise or encourage, another person to commit a crime within this state, and are afterwards found therein.

(b) Perjury, in violation of Section 118, is punishable also when committed outside of California to the extent provided in Section 118.

**Credits**
(Enacted in 1872. Amended by Stats.1905, c. 478, p. 638, § 1; Stats.1980, c. 889, p. 2789, § 2; Stats.1993, c. 610 (A.B.6), § 2, eff. Oct. 1, 1993; Stats.1993, c. 611 (S.B.60), § 2, eff. Oct. 1, 1993.)

**Editors' Notes**

**CODE COMMISSION NOTES**

**2014 Main Volume**

The amendment [of 1905] consists of a recasting of subdivision 2, designed to make it punishable in this state to embezzle money in another state and bring the money embezzled or some part of it into this state. The old section authorized the conviction and punishment of persons committing larceny or robbery outside the state, who brought the property stolen into this state, but did not extend to the case of embezzlement.

Notes of Decisions (46)

West's Ann. Cal. Penal Code § 27, CA PENAL § 27

**A-13**

Current with Ch. 1 of 2023-24 1st Ex.Sess, and urgency legislation through Ch. 101 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**A-14**

West's Annotated California Codes
Penal Code (Refs & Annos)
Part 1. Of Crimes and Punishments (Refs & Annos)
Title 7. Of Crimes Against Public Justice (Refs & Annos)
Chapter 8. Conspiracy (Refs & Annos)

West's Ann.Cal.Penal Code § 182

§ 182. Definition; punishment; venue; evidence necessary to support conviction

Effective: October 1, 2011

Currentness

(a) If two or more persons conspire:

(1) To commit any crime.

(2) Falsely and maliciously to indict another for any crime, or to procure another to be charged or arrested for any crime.

(3) Falsely to move or maintain any suit, action, or proceeding.

(4) To cheat and defraud any person of any property, by any means which are in themselves criminal, or to obtain money or property by false pretenses or by false promises with fraudulent intent not to perform those promises.

(5) To commit any act injurious to the public health, to public morals, or to pervert or obstruct justice, or the due administration of the laws.

(6) To commit any crime against the person of the President or Vice President of the United States, the Governor of any state or territory, any United States justice or judge, or the secretary of any of the executive departments of the United States.

They are punishable as follows:

When they conspire to commit any crime against the person of any official specified in paragraph (6), they are guilty of a felony and are punishable by imprisonment pursuant to subdivision (h) of Section 1170 for five, seven, or nine years.

When they conspire to commit any other felony, they shall be punishable in the same manner and to the same extent as is provided for the punishment of that felony. If the felony is one for which different punishments are prescribed for different degrees, the jury or court which finds the defendant guilty thereof shall determine the degree of the felony the defendant conspired to commit. If the degree is not so determined, the punishment for conspiracy to commit the felony shall be that prescribed for the lesser degree, except in the case of conspiracy to commit murder, in which case the punishment shall be that prescribed for murder in the first degree.

**A-15**

If the felony is conspiracy to commit two or more felonies which have different punishments and the commission of those felonies constitute but one offense of conspiracy, the penalty shall be that prescribed for the felony which has the greater maximum term.

When they conspire to do an act described in paragraph (4), they shall be punishable by imprisonment in a county jail for not more than one year, or by imprisonment pursuant to subdivision (h) of Section 1170, or by a fine not exceeding ten thousand dollars ($10,000), or by both that imprisonment and fine.

When they conspire to do any of the other acts described in this section, they shall be punishable by imprisonment in a county jail for not more than one year, or pursuant to subdivision (h) of Section 1170, or by a fine not exceeding ten thousand dollars ($10,000), or by both that imprisonment and fine. When they receive a felony conviction for conspiring to commit identity theft, as defined in Section 530.5, the court may impose a fine of up to twenty-five thousand dollars ($25,000).

All cases of conspiracy may be prosecuted and tried in the superior court of any county in which any overt act tending to effect the conspiracy shall be done.

(b) Upon a trial for conspiracy, in a case where an overt act is necessary to constitute the offense, the defendant cannot be convicted unless one or more overt acts are expressly alleged in the indictment or information, nor unless one of the acts alleged is proved; but other overt acts not alleged may be given in evidence.

**Credits**

(Enacted in 1872. Amended by Code Am.1873-74, c. 614, p. 426, § 14; Stats.1919, c. 125, p. 170, § 1; Stats.1943, c. 554, p. 2121, § 1; Stats.1953, c. 32, p. 634, § 1; Stats.1955, c. 660, p. 1155, § 1; Stats.1965, c. 924, p. 2534, § 1; Stats.1976, c. 1139, p. 5097, § 132, operative July 1, 1977; Stats.1978, c. 579, p. 1980, § 1; Stats.1983, c. 1092, § 247, eff. Sept. 27, 1983, operative Jan. 1, 1984; Stats.1989, c. 897, § 15; Stats.2001, c. 854 (S.B.205), § 20; Stats.2002, c. 787 (S.B.1798), § 8; Stats.2002, c. 907 (A.B.1155), § 1; Stats.2011, c. 15 (A.B.109), § 272, eff. April 4, 2011, operative Oct. 1, 2011.)

Notes of Decisions (878)

West's Ann. Cal. Penal Code § 182, CA PENAL § 182
Current with Ch. 1 of 2023-24 1st Ex.Sess, and urgency legislation through Ch. 101 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**A-16**

West's Annotated California Codes
Penal Code (Refs & Annos)
Part 1. Of Crimes and Punishments (Refs & Annos)
Title 7. Of Crimes Against Public Justice (Refs & Annos)
Chapter 8. Conspiracy (Refs & Annos)

West's Ann.Cal.Penal Code § 184

§ 184. Overt act; venue

Currentness

No agreement amounts to a conspiracy, unless some act, beside such agreement, be done within this state to effect the object thereof, by one or more of the parties to such agreement and the trial of cases of conspiracy may be had in any county in which any such act be done.

**Credits**
(Enacted in 1872. Amended by Stats.1919, c. 125, p. 171, § 2.)

Notes of Decisions (129)

West's Ann. Cal. Penal Code § 184, CA PENAL § 184
Current with Ch. 1 of 2023-24 1st Ex.Sess., and urgency legislation through Ch. 101 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**A-17**

Barclays California Code of Regulations
Title 3. Food and Agriculture
Division 2. Animal Industry
Chapter 10. Animal Confinement
Article 3. Breeding Pigs

3 CCR § 1322.2

§ 1322.2. Pork Distributor Registration.

Currentness

(a) Commencing January 1, 2023, any in-state or out-of-state person engaged in a commercial sale into or within the state as a pork distributor, shall hold a valid registration with the Department pursuant to this Article.

(b) Any person registering pursuant to (a) of this section shall submit an application for registration provided by the Department that contains the following information: Business name, physical address of distribution operation, mailing address, phone number, email address, website address, federal tax identification number, and name, phone number and email of person authorized to act on the applicant's behalf.

(c) The registration shall not be transferable to any person and shall be applicable only to the location for which originally issued.

(d) A registration is required for each facility location from which whole pork meat is sold, distributed, or otherwise supplied to the location of an end-user.

(e) A pork distributor shall not engage in the commercial sale of whole pork meat within, or into, California unless such person has obtained and holds a valid registration from the Department pursuant to this section for each facility location.

(f) Any change in ownership, change of business name, change in business location, closure of business, or change of name, address, phone number or email of person authorized to act on behalf of the registered distributor must be reported to the Department within 30 calendar days of such change.

(g) All information set forth on applications for registrations and renewals for registrations, including but not limited to any documentation of certification required by (*l*) of this section, shall be truthful and not misleading.

(h) Initial or renewal of a registration will be issued after the Department reviews the application and accompanying certificate of compliance, described in (*l*) of this section, to ensure information is complete and accurate.

(i) Every registration expires 12 months from the date of issue.

**A-18**

(j) A registration may be renewed each 12-month period by the Department in response to an application for renewal by a pork distributor if the business of the facility applying for renewal was conducted in accordance with the requirements of this Article and sections 25990 and 25991 of the Health and Safety Code during the preceding registration period for which the renewal is requested.

(k) A registration will remain in effect pending review and approval by the Department of an application for registration renewal, provided the application for renewal is received prior to expiration of current registration.

(*l*) An application to the Department by a pork distributor for initial registration, or for purposes of renewal, shall be accompanied by documentation of valid certification pursuant to Article 5 of this Chapter for each location where registration is being sought. A registration shall not be issued for any facility location for which the valid certification required by this section has not been submitted to the Department.

(m) For purposes of the valid certification required in (*l*) of this section, a self-certification by a pork distributor that they comply with all applicable requirements of sections 1322.4 and 1322.5 of this Article, and distributes whole pork meat within or into California only from pork producers that comply with section 1322.1 of this Article, will be accepted by the Department prior to January 1, 2024.

(n) An establishment at which mandatory inspection is provided under the Federal Meat Inspection Act (21 U.S.C. Sec. 601 et seq.) and that holds an establishment number (prefix "M") granted by the Food Safety Inspection Service of the United States Department of Agriculture with prefix of "M" is excluded from mandatory registration pursuant to this section.

**Credits**
NOTE: Authority cited: Section 25993, Health and Safety Code. Reference: Sections 25990 and 25991, Health and Safety Code.

HISTORY

1. New section filed 9-1-2022; operative 9-1-2022 pursuant to Government Code section 11343.4(b)(3) (Register 2022, No. 35). Filing deadline specified in Government Code section 11349.3(a) extended 60 calendar days pursuant to Executive Order N-40-20 and an additional 60 calendar days pursuant to Executive Order N-71-20.

This database is current through 7/28/23 Register 2023, No. 30.

Cal. Admin. Code tit. 3, § 1322.2, 3 CA ADC § 1322.2

---

**End of Document**　　　　　　　　　　　　　　　　© 2023 Thomson Reuters. No claim to original U.S. Government Works.

**A-19**

Barclays California Code of Regulations
Title 3. Food and Agriculture
Division 2. Animal Industry
Chapter 10. Animal Confinement
Article 3. Breeding Pigs

3 CCR § 1322.6

§ 1322.6. Inspection of Conveyances.

Currentness

(a) Every pork distributor by submitting an application for registration agrees as a condition of registration to provide the Department or a certifying agent, access to inspect in California any vehicle or other conveyance under the registrant's operation or control that is transporting whole pork meat into or within the state.

(b) Every person shall stop at the request of the Department at any California Border Protection Station for purposes of inspection of cargo and any accompanying shipping documents, manifests, and bills of lading, any vehicle or other conveyance transporting into or within the state whole pork meat.

(c) The Department may deny entry to or order diversion from the state any vehicle or other conveyance transporting whole pork meat intended for commercial sale that was produced, packaged, identified, or shipped in violation of the requirements of sections 25990-25992 of the Health and Safety Code, or the provisions of this Article, including but not limited to shipping document requirements specified in section 1322.4 of this Article.

**Credits**

NOTE: Authority cited: Section 25993, Health and Safety Code. Reference: Sections 25990, 25991 and 25992, Health and Safety Code.

HISTORY

1. New section filed 9-1-2022; operative 9-1-2022 pursuant to Government Code section 11343.4(b)(3) (Register 2022, No. 35). Filing deadline specified in Government Code section 11349.3(a) extended 60 calendar days pursuant to Executive Order N-40-20 and an additional 60 calendar days pursuant to Executive Order N-71-20.

This database is current through 7/28/23 Register 2023, No. 30.

Cal. Admin. Code tit. 3, § 1322.6, 3 CA ADC § 1322.6

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**A-20**

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Barclays California Code of Regulations
Title 3. Food and Agriculture
Division 2. Animal Industry
Chapter 10. Animal Confinement
Article 3. Breeding Pigs

3 CCR § 1322.7

§ 1322.7. Tagging and Seizure of Whole Pork Meat.

Currentness

(a) The Department may affix a warning tag or notice to shipping documents, manifests, containers, sub-containers, lots, or loads of whole pork meat which have been produced, packaged, stored, labeled, marked, identified, transported, delivered, or sold in violation of the requirements of sections 25990-25992 of the Health and Safety Code, or the provisions of this Article. When a warning tag or notice is issued, the Department shall give written notice of such violation to the pork producer, pork distributor, owner, or other person in possession of the whole pork meat.

(b) No person shall remove a warning tag or notice from the place it is affixed except upon written permission or specific direction of the Department.

(c) The Department may seize and hold any containers, sub-containers, lots or loads of whole pork meat in California which they have reasonable suspicion to believe is in violation of the provisions of sections 25990-25992 of the Health and Safety Code, or the provisions of this Article. If the Department seizes any container, sub-container, lot, or load of whole pork meat, a written hold notice shall be issued to the person that has control of the whole pork meat, and a tag or notice may be affixed to the container, sub-container, lot, or load which states it is so held.

(d) Any whole pork meat for which a hold notice is issued shall be held by the person having control of the whole pork meat and shall not be disturbed, moved, diverted, or offered for sale except under the specific directions of the Department.

(e) A person may request an informal hearing to contest tagging, hold notice, or seizure of whole pork meat pursuant to section 1327.1 of this Chapter.

**Credits**
NOTE: Authority cited: Section 25993, Health and Safety Code. Reference: Sections 25990, 25991 and 25992, Health and Safety Code.

HISTORY

1. New section filed 9-1-2022; operative 9-1-2022 pursuant to Government Code section 11343.4(b)(3) (Register 2022, No. 35). Filing deadline specified in Government Code section 11349.3(a) extended 60 calendar days pursuant to Executive Order N-40-20 and an additional 60 calendar days pursuant to Executive Order N-71-20.

**A-21**

This database is current through 7/28/23 Register 2023, No. 30.

Cal. Admin. Code tit. 3, § 1322.7, 3 CA ADC § 1322.7

**End of Document**                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**A-22**